STATE of Minnesota, Appellant (81–491), Respondent (81–530),

v.

MING SEN SHIUE, Respondent (81–491), Appellant (81–530).

Nos. 81–491, 81–530.

Supreme Court of Minnesota.

Dec. 3, 1982.

Warren Spannaus, Atty. Gen., St. Paul, Robert W. Johnson, County Atty., and Robert A. Stanich, Asst. County Atty., Anoka, for the State.

Meshbesher, Singer & Spence, Ronald Meshbesher, Cheryl Divine and Carol Grant, Minneapolis, for Shiue.

TODD, Justice.

Ming Sen Shiue has been convicted of the kidnapping of Mary Stauffer and her 8-year-old daughter.[1] During the commission of that crime, Shiue encountered a 6-year-old child, Jason Wilkman. Shiue kidnapped Wilkman and took him to the Carlos Avery Wildlife Farm. Later, police discovered Wilkman's body and Shiue was charged with murder in the second degree. Shiue pled not guilty, and not guilty by reason of mental defect. At a bifurcated trial, the jury found Shiue guilty rejecting his defense of mental illness. The trial court sentenced Shiue to a term of 40 years to be served concurrent with his federal sentence. Shiue appeals, alleging numerous errors requiring a new trial. The state appeals, claiming that the trial court abused its discretion in not imposing a sentence consecutive to Shiue's federal term. We affirm.

On May 16, 1980, Ming Sen Shiue abducted Mary Stauffer and her eight-year-old daughter Elizabeth from the parking lot of a beauty salon in Roseville, Minnesota. Shiue forced Mary Stauffer to drive her car according to his directions. After nearly an hour of driving, Mrs. Stauffer was told to stop the car in a deserted area of Anoka County. Shiue tied and gagged the Stauffers, using rope and tape he brought with him. He placed them in the trunk of the car and drove off.

During the ride, defendant stopped to check on the Stauffers several times. The first time, Mrs. Stauffer had untied Elizabeth. Defendant was angry and tied them more tightly. The last time defendant stopped, the Stauffers had again loosened their bonds. Shiue unscrewed a metal plate which secured the spare tire and discarded it, then dropped the spare tire on the Stauffers. At that point, defendant heard someone say "Hi."

Jason Wilkman had been playing with his friend Mark Branes when they came upon the Stauffers' car. Mark stayed at the front of the car while Jason walked up to the trunk. When Shiue heard Jason's voice, he turned and grabbed him, placing his hand over his mouth, and threw him into

---

1. *See United States v. Ming Sen Shiue,* 508 F.Supp. 455 (D.Minn.1980), 508 F.Supp. 460 (D.Minn.1981), *aff'd,* 650 F.2d 919 (8th Cir. 1981).

the trunk. Shiue drove off with the Stauffers and Jason Wilkman.

The Stauffers were in the trunk with Jason for approximately an hour. Both Mrs. Stauffer and Elizabeth tried to comfort Jason, who was crying. They asked him his name and he replied, "Jason." He said he was six years old and that now he wouldn't be able to go to his grandma's the next day.

Shiue drove to a deserted area where the Stauffers could hear gravel and brush striking the wheel wells and sides of the car. The car stopped. Shiue opened the trunk and took Jason out. Elizabeth saw Shiue take a "long bent bar" made of metal out of the trunk. Shiue closed the trunk and was gone from ten to fifteen minutes. When he returned, the drive resumed. After another hour, the car stopped and the Stauffers were left for a time. Finally Shiue returned and transferred them to another vehicle, drove them to defendant's home and placed them in a closet.

The Stauffers were confined in Shiue's house at 1960 N. Hamline Avenue for the next seven weeks. During that time, the Stauffers were primarily confined to the closet, tied at the elbows, with the closet door shut and the door knob removed. Mrs. Stauffer was frequently sexually assaulted by Shiue. Several of these conversation-assault sessions were recorded by Shiue on video tape.

During the first week of captivity, Shiue talked about Jason on four separate occasions. On the night of the kidnapping, May 16, Shiue told Mrs. Stauffer that he had taken Jason into the woods and threatened him by saying if he ever told anyone what had happened he would return and hurt him. Shiue said, "I just scared him and, then, I fired a shot over his head and, then, let him go." Mrs. Stauffer never heard any shots.

On Saturday evening, May 17, Shiue said that the only thing that had gone wrong with his plan was "that kid showing up." Shiue went on to say:

[E]ven if they find him, he didn't get a very good look at me. I had the dark glasses on, and I scared him good enough so that I know he's not going to do anything * * *, and even if he does, there's no way * * * a six-year-old is going to pick me out of a lineup. I never seen him in my life, and he never seen me in my life. And all he saw was your car. So there's no way he will ever get back to me. So I'm not worried about him, see, he's, he represents no threat to me * * *.

The next Thursday, May 22, while washing their clothes, Mrs. Stauffer noticed a blood stain on her pants. When she asked Shiue about it, he said that Jason had gotten a bloody nose when he was thrown into the trunk. Finally, on the following Saturday, May 24, there was a news broadcast that indicated authorities were searching for Jason and the Stauffers, east into Wisconsin and northeast of the Twin Cities. Mrs. Stauffer asked why Jason had not been found and Shiue said, "They're looking in the wrong direction."

On July 7, Mrs. Stauffer found that she could remove the hinge pins of the closet door. She and Elizabeth freed themselves, called the authorities, and escaped. Shiue was arrested the same day at his electronics business.

In September of 1980, after a ten-day federal trial, the jury found Shiue guilty of kidnapping. Prior to this trial, Shiue told one of the psychiatrists that he knew the location of Jason Wilkman's body but would not reveal it. In late October, the week before Shiue was to be sentenced by Judge Devitt, he entered into an agreement with the Ramsey County Attorney's office. If Shiue would locate Wilkman's body, the Ramsey County Attorney's Office agreed that the charge would not be first degree murder.

At Shiue's direction, police conducted a large-scale search in the Carlos Avery Wildlife Reserve. Shiue walked to the treeline at the edge of a cornfield and said, "This is the area where the body should be." After a search party looked without success for a day, Shiue insisted, "It's got to be there. I know it's there. You just got to find it." Finally, one of the searchers found the skel-

eton of a child in a dense brushy area on the edge of the cornfield under a stand of birch trees. The remains, which were covered with branches and cornstalks, were identified as those of Jason Wilkman. An autopsy revealed fractures on the back and right side of the skull. The examining pathologists testified that the cause of death was severe cerebral trauma caused by at least two blows to the head with a blunt instrument administered with a great deal of force. The pathologists stated that the fractures were consistent with having been produced by a rounded metal instrument, with a curve in it, such as a jack handle. In the opinion of the medical examiner, either blow could have caused death.

Defendant's trial for the kidnapping and murder of Jason Wilkman began on January 14, 1981, in Anoka County District Court. Jury selection lasted for more than three weeks. 338 jurors were questioned before a panel of fourteen was selected.

Defendant chose to bifurcate his trial. During Phase I, the jury would determine defendant's guilt for kidnapping and murder in the second degree. If the defendant was found guilty of either of the offenses, phase II would begin, in which the jury would decide if defendant was innocent by reason of a mental defect.

Mary Stauffer was one of the first state witnesses to testify during Phase I of the trial. Just after defense counsel began his cross-examination of her, and in the presence of the jury, Shiue attacked Mrs. Stauffer, cutting her face with a knife. The cut required 62 stiches to close. After the attack, psychiatrists for the state and defense examined Shiue and found him competent to stand trial. The court instructed the jury that they could consider the attack in their later deliberations. It indicated that more detailed instructions would be given at the conclusion of the trial.

On February 13, 1981, at the conclusion of the first stage of trial, the jury found the elements of each crime had been proved beyond a reasonable doubt. On February 14, 1981, the second phase of the trial began. Four experts in psychology testified as to Shiue's mental state on May 16, 1982.

After the deliberations began in phase II, the jury requested the video tapes of Shiue's sessions with Mrs. Stauffer which had been shown at trial. The jury asked to look at the first one, and then "possibly come out and see other ones. We'd like to go one at a time."

At approximately 2:40 p.m. the afternoon of Friday, February 20, 1981, the jury sent a note to the court stating "We are a hung jury. What do we do now?" The trial court, without notifying counsel, and without making a record, advised the jury through the bailiff to look at the remaining tapes.

Later that afternoon, at 6:08 p.m., a discussion of the incident was placed in the record. The court indicated that it told the bailiff to advise the jury "to continue viewing the other two tapes as they had originally requested." The court continued:

It was my opinion at the time that we have spent almost five weeks on this case and they had deliberated yesterday and today less than ten hours and that that wasn't sufficient to constitute a so-called hung jury. It is now 10 after 6:00 and we have received another note. It reads, as follows:

"We are still a hung jury. One Juror is closed-minded to others' views and is becoming upset and distraught."

So, inadvertently it appears that they have advised us that the vote is eleven to one.

Defense counsel made a motion for a mistrial. He stated:

Because of the two notes submitted to the Court, the Defendant moves for a mistrial, since the Jury has now indicated on two separate occasions almost four hours apart that they are a hung Jury. I wasn't informed of the first note until after—Some time after the Court made the communication to the Jury through Loretta. I think that communication, although well-intentioned by the Court, may have misconstrued because the Court instructed them to view additional evidence, even though they didn't request it, and I think that in itself may be grounds

for a mistrial, but regardless of that, the second note now indicates that the Jury is still hung and that one Juror is becoming upset and distraught and I think to force Jurors to continue deliberations under those conditions could result in a Verdict that might be considered coercive because the Juror who is distraught and upset may not have the will to overcome the persuasive powers of the other Jurors, even though it's contrary to their beliefs. I think we have a real serious situation when one of the Jurors is described in that condition. For all these reasons, I would move for a mistrial.

The court went on to deny the motion, stating for the record that:

Well, your recitation that I required them to see additional evidence that they had not requested is in error. They requested formally on the record that they be permitted to see all three additional tapes, and as I instructed them, that Loretta would be with them during the viewing to operate the machinery. They were not to discuss it in the Courtroom and they requested before I even suggested it that they see each tape individually, then, adjourn to the Jury Room, discuss it, come back and see the next tape, return to the Jury Room and discuss it, and see the third tape and return to the Jury Room and discuss it, and when I sent a message to them to complete the tapes, I was simply granting their request to review the visual tapes. Apparently they were seeking to resolve some issues through the use of the tapes and they requested them in their entirety and the Court felt that they should view them in their entirety.

This is the first indication that we have got of what the vote is, that they apparently are eleven to one. The Court intends to reread, pursuant to the A.B.A. Standards, the Instruction regarding their obligations as Jurors to discuss the case with one another. Having reviewed the so-called Allen Instruction that has been ruled out in Minnesota, the Court intends to follow the A.B.A. Standards and follow the ruling of our Supreme Court in *State v. Martin.* The Court is of the opinion that in view of the length of time it took to select a Jury in this case, I believe it was approximately three weeks, and having gone through, I believe, 338 jurors and obtained a Jury panel which was satisfactory to both parties, that the deliberations of the Jurors in this case has not been lengthy enough at this time to permit them to exhaust their deliberations. So, the Court will reread to them the Instructions as indicated and deny the motion for mistrial.

On February 21, 1981, at the conclusion of the second stage of trial, the jury found the defendant guilty of kidnapping and murder in the second degree. On February 27, 1981, a motion for judgment of acquittal or new trial was filed with the court. In addition to these motions, counsel sought summary hearings to impeach the jury verdict pursuant to Minn.R.Crim.P. 26.03, subd. 19(6). In an affidavit filed by defense counsel, jury misconduct was alleged on the basis of articles in the local papers after interviews with the jurors. Defense counsel argued that one juror had more knowledge of Shiue's federal conviction than she revealed during voir dire. The court denied the motion, indicating that counsel had an opportunity to inquire of this juror but failed to do so.

On March 2, 1981, a hearing was conducted prior to imposition of sentence. Richard Green testified that he met Shiue in the Ramsey County jail on July 7, 1980. Green suggested that Shiue had offered him money to either kill the Stauffers or to help him escape. Shiue did pay Green one thousand dollars but claimed it to be a gambling debt. Green's testimony was not persuasive to the court. He had a prior felony conviction and didn't mention a contract to kill until after the second F.B.I. interview. The court refused to consider this incident during sentencing.

Under the Sentencing Guidelines, the severity level for second degree murder is ten. Defendant had a criminal history score of one. The presumptive sentence is 140 months. The presentence investigation report cited seven aggravating factors and

recommended a forty-year sentence which is the maximum deviation under the guidelines. It also recommended the sentence to run consecutively with Shiue's federal sentence. The Honorable Robert Bakke (deceased) sentenced the defendant to serve forty years concurrently with his federal sentence.

The court deviated in duration. It justified its deviation on the basis of the victim's youth and vulnerability, the lack of provocation by the victim, the victim's terror, the breaking and entry of the Stauffer's home on three previous occasions and the fact a victim was injured in defendant's previous felony.

In light of the jury's findings, the court did not consider mental illness to be a mitigating factor. The court refused to consider Mr. Green's testimony in deciding whether to deviate, stating that it followed the purposes of the sentencing guidelines and the A.B.A. standards on sentencing, which oppose the pyramiding of sentences. It concluded that "should the defendant be released before 40 years, he will then be committed to the Commissioner of Corrections to serve the remainder of the forty years' sentence." From this sentence and defendant's conviction for the crimes of kidnapping and murder in the second degree, this appeal follows.

This appeal presents the following issues:

1. Did the contact between the trial court and jury in the absence of counsel and not on the record constitute reversible error?

2. Was the failure of the trial court to declare a mistrial or allow voir dire of the jury after the defendant attacked the state's chief witness in the presence of the jury a denial of defendant's right to a fair trial by an impartial jury?

3. Was the trial court's decision to deviate from the presumptive sentence and impose the statutory maximum justified?

4. Was the trial court's decision to run defendant's sentence concurrently with his federal kidnapping sentence an abuse of discretion?

1. As previously indicated, the jury had been deliberating when it contacted the court at 1:08 p.m. on February 20, 1981. It requested the court to review additional evidence, specifically, the video tapes which had been shown at trial. The trial judge granted the request after conducting the jury to the courtroom and notifying counsel. Following this, the jury viewed the first tape and then adjourned to discuss it. At 2:40 p.m. the first note was received regarding the possibility of a hung jury. The judge advised the jury to view the other two tapes as they had originally requested. This was done. At 6:08 p.m. on the same day, a second note was received, again indicating a hung jury. Defense counsel objected on the record to the contact between the judge and the jury and moved for a mistrial which was denied.

In analyzing this problem, it is necessary to keep in mind that the jury had a right to view the video tapes since they had been received into evidence. Minn.R. Crim.P. 26.03, subd. 19(2). It is within the discretion of the trial court to grant such a request. *State v. Spaulding,* 296 N.W.2d 870, 878 (Minn.1980). The trial court followed the appropriate procedure under Minn.R.Crim.P. 26.03, subd. 19(2), by conducting the jury to the courtroom after notifying counsel. After viewing one tape, the trial judge regarded the jury's message as a continuation of its original request for additional evidence. This was not unreasonable in the context of the events that had transpired. The jury had previously indicated it might view all three video tapes, but would view them one at a time. Under these circumstances, the trial judge was not required to conduct the jury to the courtroom and notify counsel before the showing of each tape. Viewed from this perspective, there was no prejudice to the defendant.

The trial judge made a record of the incident after its occurrence. The court's recollection of the incident was uncontroverted. We conclude that the contact between the judge and the jury was not of the type that requires application of legal standards concerning communication between a judge and jury outside the presence of counsel and off the record. *See Gersdorf*

*v. R.D. Werner Co., Inc.,* 316 N.W.2d 517 (Minn.1982); *Cronquist v. City of Minneapolis,* 258 Minn. 30, 102 N.W.2d 512 (1960); *State v. Schifsky,* 243 Minn. 533, 69 N.W.2d 89 (1955).

2. Shiue attacked Mrs. Stauffer in open court and in the presence of the jury. Defense counsel sought a mistrial which was denied by the trial court. The majority view is that such disruptive conduct is not grounds for a mistrial. *See Blackwell v. Wolff,* 403 F.Supp. 759 (D.Neb.1975), aff'd. sub. nom. *Blackwell v. Parratt,* 526 F.2d 1142 (8th Cir.1975) (no error where trial court did not declare mistrial nor admonish jury after defendant's courtroom outbursts); *State v. Blackwell,* 184 Neb. 121, 165 N.W.2d 730 (1969) (defendant's outbursts completely his own doing did not justify mistrial); *State v. Paul,* 83 N.M. 527, 494 P.2d 189 (App.1972) (defendant's outbursts during voir dire did not justify mistrial); *Layman v. State,* 1 Tenn.Cr.App. 83, 429 S.W.2d 832 (1968) (misconduct of co-defendant did not justify mistrial); *Chamberlain v. State,* 453 S.W.2d 490 (Tex.Cr.App. 1970) (scuffle between robbery defendant and deputies did not justify mistrial). Cf. *State v. Scott,* 323 N.W.2d 790 (Minn.1982) (physical restraint of defendant permissible where reasonably and eminently necessary.) *See Generally* Annot., 89 A.L.R.3d 960 (1979). The rationale for these decisions is that a criminal defendant should not be permitted to take advantage of his own misconduct. We agree with the statement of Mr. Justice Brennan in *Illinois v. Allen,* 397 U.S. 337, 349–50, 90 S.Ct. 1057, 1063–64, 25 L.Ed.2d 353 (1970) (concurring opinion):

> Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong. To allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes.

The record indicates that the trial court took all reasonable steps to guarantee defendant's right to a fair trial. It instructed the jury that the incident could not be considered in determining whether defendant was guilty of the substantive offenses. It also instructed that the state's burden of proof remained exactly the same as if the incident had never occurred. We conclude that the defendant was not denied a fair trial by the failure of the trial court to declare a mistrial or to allow additional voir dire of the jury.

We have considered and analyzed the numerous remaining issues presented by Shiue and conclude that they are without merit and find no necessity to discuss them in detail.

3. The trial court deviated from the Sentencing Guidelines in imposing the statutory maximum of forty years' imprisonment. Minn.Stat. § 609.19 (1980). Defendant had a criminal history score of one for his federal conviction of kidnapping. The presumptive sentence for second degree murder with such a score is 140 months. Defendant's sentence of 480 months was 3.4 times greater than the presumptive sentence.

The trial court cited as grounds for departure the following: 1) vulnerability of the victim; 2) victim did nothing to provoke his kidnapping and murder; 3) victim was treated with particular cruelty by being thrown into the trunk of a car and was in terror for one hour; 4) there was a prior felony offense involving injury to the victim, as was the case here; 5) defendant's conduct involved extensive planning, guile, cunning and concealment; and 6) although defendant had no prior felony record, his admitted break ins would be considered to negate his lack of a felony record.[2] The court specifically did not consider the plea bargain of the defendant,[3] the courtroom

---

2. Defendant in his conversations with Mary Stauffer, as revealed on the video tapes and her testimony, had admitted breaking into the home of her in-laws in Duluth and terrorizing them several years earlier, and also admitted that he had three times attempted to break into the Stauffer's apartment.

3. The prosecuting authorities agreed that if Shiue were to assist them in locating Jason Wilkman's body, they would not charge him with first degree murder.

attack on Mrs. Stauffer, nor the evidence regarding the attempt to kill the witness Stauffer and to assist Shiue in escaping from jail. The court considered the mental impairment factor, but concluded that it would not give much credence to this since Shiue's illusions and obsessions involved Mrs. Stauffer and not the victim, Jason Wilkman.

 We particularly note that the concealment was an aggravating factor to be considered. For five months, Jason Wilkman's family suffered a great deal of trauma, not knowing whether their son was dead or alive. The victim's body was affirmatively concealed by the defendant. It had been covered with "branches, twigs, leafy matter, and brush." It was difficult to observe. The body was so concealed that, even after the defendant brought authorities to its approximate location, they still searched for an entire day.

The inclusion of concealment as an aggravating factor is justified not only by the trauma to close relatives, but by independent policy reasons. At the time of the initial concealment of the body Shiue's only concern was to avoid discovery of the crime. However, after his arrest he was able to use the concern of the parents and the authorities as to the whereabouts of Jason. He negotiated an agreement to disclose the whereabouts of the body in exchange for an agreement to forego prosecution for first degree murder. Other accused persons could view this as an appropriate tool in negotiating a plea. However, by including concealment as an aggravating factor, the authorities or counsel for an accused are in a position to advise that such refusal may lead to an increased sentence.

Concealment has never been considered by this court as an aggravating factor. It has been found to be an appropriate consideration in other jurisdictions. *See Gardner v. State,* Ind., 388 N.E.2d 513, 518 (1979) (attempted concealment of victim's body properly considered as aggravating factor in sentencing); *People v. Saiken,* 49 Ill.2d 504, 275 N.E.2d 381 (1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1499, 31 L.Ed.2d 796 (1972). It is appropriate here.

■ Based on these considerations we conclude that the trial court was justified in departing from the presumptive sentence beyond doubling to the 3.4 times herein imposed. *See State v. Herberg,* 324 N.W.2d 346 (Minn.1982).

■ 4. The state contends that the trial judge erred in not imposing a sentence consecutive to Shiue's previous federal life sentence. The state contends that by the nature of the sentence Shiue receives no real punishment for the heinous crime involved and the public is not adequately protected. Shiue theoretically could be released from prison in 26 years, 8 months. However, the state concedes that the decision to impose a consecutive sentence is discretionary with the trial judge. In this case we find no abuse of such discretion.

Affirmed.