STATE of Minnesota, Respondent,

v.

Mo Savoy HICKS, Appellant.

No. A12–1107.

Court of Appeals of Minnesota.

Sept. 3, 2013.

Review Granted Nov. 12, 2013.

Lori Swanson, Attorney General, St. Paul, MN, Anthony C. Palumbo, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, St. Paul, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Benjamin, J. Butler, Assistant Public Defender, St. Paul, MN, for appellant.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Considered and decided by KALITOWSKI, Presiding Judge; CHUTICH, Judge; and HARTEN, Judge.*

## OPINION

CHUTICH, Judge.

On appeal from his conviction of second-degree unintentional felony murder, appellant Mo Savoy Hicks argues that the district court: (1) violated the Minnesota Code of Judicial Conduct and deprived him of his right to an impartial fact-finder; (2) erred by excluding the public from his trial; and (3) erred by imposing an upward durational departure based solely on concealment of the victim's body. Hicks makes two pro se arguments as well.

Because the district court did not violate the Minnesota Code of Judicial Conduct in making a factual determination or violate Hicks's right to a public trial, we affirm his conviction. Because the record supports the district court's determination that the crime was committed with particular cruelty, we also affirm Hicks's sentence.

## FACTS

On August 22, 2007, R.G. reported her sister, J.R., missing. Several police officers went to J.R.'s apartment in Columbia Heights to conduct a welfare check. The officers entered the apartment and discovered blood stains in the living room, hallway, and bedroom. The following day, officers returned to execute a search warrant for J.R.'s apartment. In the bedroom, the officers found what appeared to be blood on the rug, floor, mattress, and bedroom walls. J.R.'s bed had one purple sheet on it and no pillowcases. The officers also found three bloody shoe prints,

Minn. Const. art. VI, § 10.

later determined to be from a K–Swiss shoe, in the hallway. No evidence suggested that J.R.'s apartment had been broken into or burglarized.

The investigating officers determined that J.R. was last in touch with her daughter, T.F., on August 2, 2007. T.F. told the officers that J.R. was at J.R.'s apartment with appellant Mo Savoy Hicks. Officers conducted a non-custodial interview with Hicks at his residence. During the interview, Hicks denied any involvement with J.R.'s disappearance. When asked if he knew where J.R. might be, Hicks replied, "She's my—she was my friend. I—she is my friend." Hicks voluntarily surrendered keys for J.R.'s apartment and mailbox, claiming that J.R. gave him the keys in April of 2007 to get her mail while she was out of town. Hicks also surrendered a pair of K–Swiss shoes. Hicks voluntarily accompanied the officers to the police station to further discuss the case. There, he told officers that he spent the night of August 3 at J.R.'s apartment and J.R. was fine when he left the following morning.

Officers also interviewed J.R.'s ex-boyfriend, K.R. K.R. told the officers that he and J.R. ended their relationship in 2002 or 2003 but remained friends. Forensic officers swabbed K.R. for blood and other evidence but found no connection to J.R. K.R. denied knowing where J.R. was.

During the investigation, a citizen with the same last name as the victim, R.R., contacted the investigating officers. She explained that, at 11:08 a.m. on August 4, 2007, she received a phone call, but the caller did not leave a message. The citizen received a second call at 11:26, and the caller left a message stating, "If this is [J.R.]'s sister, I just caught up with her; you might want to check on her." The citizen did not know J.R. Officers traced the calls to a pay phone at a SuperAmerica

gas station and to a pay phone outside a Walgreens, both in Brooklyn Center.

There was no video surveillance of the two pay phones, so officers reviewed surveillance video taken inside the SuperAmerica and Walgreens around the time the calls were placed. Video from both stores captured a man later identified as L.M. Officers interviewed L.M., who lived near the two stores, and concluded that he had no connection to J.R. or her disappearance.

On August 28, 2007, the Anoka County Medical Examiner, Dr. Janis Amatuzio, determined that J.R. could not have survived after she lost the volume of blood discovered on the mattress, floor, and walls. The following day, officers interviewed Hicks again. Hicks admitted that he had previously lied when he said that he spent the night of August 3 at J.R.'s apartment. Hicks told the officers that he was at the apartment, but he left the apartment to buy cocaine in Minneapolis and did not return until the following morning. He also said that J.R. did not give him her keys in April, but that he got them the morning of August 4. The officers released Hicks after the interview.

The investigating officers made no arrests in the case. In July 2008, a judge declared J.R. legally dead.

Almost three years passed before human remains were discovered buried in a park in Brooklyn Park. DNA analysis revealed that the remains were J.R.'s decomposed body. Authorities arrested Hicks and charged him with second-degree intentional murder and second-degree felony murder.

Hicks waived his right to a jury trial and represented himself at trial. His court trial took place over twelve days. The state called several investigators to testify, including Lieutenant Steven Johnson of

the Anoka County Crime Lab. Johnson testified that the tread on the shoes that Hicks surrendered to officers matched the tread pattern of the bloody shoe prints found in J.R.'s hallway. In addition, human blood was discovered on both of Hicks's K–Swiss shoes. The state also called Hicks's mother, who testified that she saw Hicks place a "pinkish or purplish" fitted sheet into the outdoor trash can at the house that she shared with Hicks on either August 5 or August 12, 2007. P.E., Hicks's next-door neighbor, testified that she saw Hicks throw a lavender colored pillow case into her trash can around the same time period. P.E. stated that when Hicks saw her watching him, he moved the pillow case to his trash can.

The state also called K.R. and L.M., the two other men questioned during the investigation. K.R. testified that he last saw J.R. in June 2007. K.R. admitted that he was verbally and physically abusive to J.R. during their relationship, but denied any connection with her disappearance and murder. L.M. also denied any involvement in J.R.'s disappearance. The district court found their testimony credible and persuasive.

Dr. Owen Middleton, Assistant Hennepin County Medical Examiner, examined the skeletal remains and testified that the cause of death was blunt force cranial injury. He could not rule out a hammer as the object that caused the cranial fractures.

The state called two witnesses who were incarcerated with Hicks at the Anoka County Jail. One witness, D.F., testified that Hicks told him he "hit [J.R.] in the head with the steel," but he did not explain what he meant by "the steel." Another witness, D.T., testified that Hicks told him he hit J.R. on the head with a hammer and

then buried her near a place where Hicks had previously lived. D.F.'s and D.T.'s testimony included details that were not available in the complaint or media reports.

The district court convicted Hicks of second-degree felony murder, but acquitted him of second-degree intentional murder. The state sought a sentencing departure, and on February 17, 2012, the district court held a *Blakely* hearing. The district court found that the crime was committed in a particularly cruel way because Hicks concealed the body. It then sentenced Hicks to 420 months, a double durational departure from the 210–month presumptive sentence. Hicks now appeals his conviction and sentence.

## ISSUES

I. Did the district court violate the Minnesota Code of Judicial Conduct?

II. Did the district court err by closing the courtroom?

III. Did the district court err by ruling that the concealment of the victim's body made the crime particularly cruel?

IV. Do either of Hicks's pro se arguments have merit?

## ANALYSIS

### I. District Court's Factual Findings

Hicks first contends that the district court improperly used facts not in evidence to resolve a fact issue in the case, specifically whether Hicks left a voice mail message on August 4, 2007, for R.R. At trial, neither the voice-recognition expert hired by the state nor Hicks's mother was able to identify the voice on the message as Hicks's voice.[1] But, in its findings of fact,

---

1. The voice recognition expert testified that

the voice mail message was too brief to ana-

the district court found that Hicks left the message:

> The Court listened to the audio recording of the voicemail message ... and has determined that the individual speaking is the Defendant. The Court makes this determination after having conducted several hearings in this matter, including trial, during which the Court had ample opportunity to hear the Defendant speak. The Court recognizes the voice of the Defendant.

### Minnesota Code of Judicial Conduct

Hicks claims that the district court judge violated the Minnesota Code of Judicial Conduct when the judge used his personal knowledge of Hicks's voice to conclude that Hicks was the caller on the voice mail message. To support his argument, Hicks cites *State v. Dorsey*, 701 N.W.2d 238 (Minn.2005). We conclude that, under the circumstances present here, *Dorsey* stands for the opposite conclusion, that the judge was *not* required to disqualify himself under the judicial code.

 Whether a judge violated the code of judicial conduct is a question of law, which we review de novo. *State v. Pratt*, 813 N.W.2d 868, 876 (Minn.2012). The code states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to [instances where]: (1) the judge has ... personal knowledge of facts that are in dispute in the proceeding." Minn.Code Jud. Conduct Rule 2.11(A). " '[P]ersonal knowledge' pertains to knowledge that arises out of a judge's private, individual connection to particular facts." *Dorsey*, 701 N.W.2d at 247. It does not, however, apply to knowledge that a judge acquires "in the course of her general judi-

cial capacity or as a result of her day-to-day life as a citizen...." *Id.*

In *Dorsey*, a witness mentioned a man named L.P. during her testimony. *Id.* at 242. The judge had knowledge of L.P. because L.P. had appeared before the judge in court several times before L.P. was murdered. *Id.* at 244. The judge stated on the record that, given the date of L.P.'s death, the witness's time frame was not believable. *Id.* at 243. The supreme court concluded that the judge's statement was not based on "personal knowledge" because she had gained knowledge of L.P.'s death "in the course of her general judicial capacity or as a result of her day-to-day life as a citizen...." *Id.* at 247. Accordingly, the court concluded that the judge was not required to disqualify herself under the judicial code. *Id.*

 Here, like *Dorsey*, the district court judge was not required to disqualify himself under the judicial code because the source of his knowledge was not personal. As Hicks admits, the judge was aware of the sound of Hicks's voice because Hicks was representing himself and the judge had "conducted several hearings in the matter, including trial." The judge conducted these hearings in his "general judicial capacity." *See id.* at 247. No evidence in the record suggests that the district court judge had any "private or individual connection" to Hicks apart from Hicks's appearances before the district court on official judicial business. *See id.* Accordingly, the district court judge did not violate rule 2.11 by making a factual finding based on personal knowledge.

### Impartial Fact–Finder

Alternatively, Hicks contends that he is entitled to a new trial because he was deprived of his constitutional right to an

lyze with the available technology.

impartial fact-finder. This contention is unpersuasive.

■■■■ Whether a defendant is deprived of his right to an impartial fact-finder is a constitutional question that this court reviews de novo. *Dorsey,* 701 N.W.2d at 249. "An impartial trial requires that conclusions reached by the trier of fact be based upon the facts in evidence and prohibits the trier of fact from reaching conclusions based on evidence sought or obtained beyond that adduced in court." *Id.* at 249–50 (citation omitted); *see also* Minn. Code Jud. Conduct Rule 2.9(C) ("A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed."). It is "impermissible for a trial judge to deliberately set about gathering facts outside the record of a bench trial over which he was to preside." *Dorsey,* 701 N.W.2d at 250 (quotation omitted). In determining whether a judge is an impartial fact-finder, "the question is whether an objective examination of the facts and circumstances would cause a reasonable examiner to question the judge's impartiality." *State v. Burrell,* 743 N.W.2d 596, 601 (Minn.2008).

■■■ Applying these principles to the circumstances here, we conclude that the district court's impartiality may not be reasonably questioned. To be sure, Hicks is correct that the sound of his voice was not specifically adduced at trial. But the issue of whether his was the voice on the voice mail message was specifically raised at trial, and two witnesses—a voice identification expert and Hicks's mother—testified about this issue.

The district court, acting as the fact-finder in this bench trial, had the duty to evaluate this testimony. Moreover, testimony about voice recognition is not limited to experts but to anyone with firsthand knowledge of a voice. *See* Minn. R. Evid. 901(b)(5) (providing that firsthand knowledge of a voice is satisfactory authentication for admissibility of voice identification evidence). The district court in this fact-finder role was capable of making, and entitled to make, a voice comparison finding. After all, the district court had the opportunity to listen to Hicks's voice every day of the twelve-day trial, not to mention the pretrial proceedings. Critically, nothing in the record demonstrates that the district court independently investigated the sound of Hicks's voice outside of the scope of the trial.

Just as the jurors who would have heard Hicks testify or represent himself could have properly compared his voice to that on the voice message, in part to determine the credibility of Hicks's mother, the judge as fact-finder could decide an issue of fact specifically raised at trial. In sum, the judge's use of his knowledge about the sound of Hicks's voice, knowledge which was gleaned in official court proceedings, did not violate Hicks's right to an impartial fact-finder.

## II. Closed Courtroom

■■■ Hicks asserts that the district court's closure of the courtroom at various times during the trial violated his right to a public trial. Hicks did not object to these closures during the trial, and in fact, either requested or agreed to each closure. Nevertheless, a violation of the Sixth Amendment right to a public trial "is considered a structural error that is not subject to a harmless error analysis." *State v. Bobo,* 770 N.W.2d 129, 139 (Minn.2009). A defendant need not timely object to preserve a structural error for appeal; instead, structural errors "require automatic reversal because such errors call into question the very accuracy and reliability of the trial process." *State v. Everson,* 749 N.W.2d 340, 347 (Minn.2008) (quotation

omitted). Therefore, we consider de novo whether the court closures violated Hicks's right to a public trial. *Bobo*, 770 N.W.2d at 139.

The Sixth Amendment protects an accused's right to an open, public trial. U.S. Const. amend. VI; *see also* Minn. Const. art. I, § 6.

> [T]he requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.

*State v. Mahkuk*, 736 N.W.2d 675, 684 (Minn.2007) (quoting *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984)).

■ Before closing the courtroom to the public, a district court must apply the four-part test set out in *Waller v. Georgia*. *Id.* at 684–85. Under this test, a courtroom closure may be justified if (1) "[t]he party seeking to close the hearing … advance[s] an overriding interest that is likely to be prejudiced"; (2) the closure is "no broader than necessary to protect that interest"; (3) the district court considers "reasonable alternatives to closing the proceeding"; and (4) the district court makes "findings adequate to support the closure." *State v. Fageroos*, 531 N.W.2d 199, 201 (Minn.1995) (quotation omitted).

■ This analysis is unnecessary, however, when the closure is too trivial to amount to a violation of the Sixth Amendment. *State v. Lindsey*, 632 N.W.2d 652, 660 (Minn.2001). Some factors a court may consider in determining whether a closure is trivial are (1) whether the courtroom was ever cleared of all spectators;

(2) whether the district court judge told the individuals in the courtroom that they were welcome to stay; (3) whether the trial remained open to the public and press already in the courtroom; (4) whether the district court ever ordered removal of members of the public, press, or the defendant's family; and (5) whether the closure comprised a disproportionately large portion of the trial proceedings. *State v. Brown*, 815 N.W.2d 609, 617–18 (Minn. 2012).

■ On appeal, Hicks challenges three brief closures that occurred during "chambers conferences" held in the courtroom, primarily to discuss a redacted transcript and proposed testimony of a witness.[2] Specifically, the trial judge first closed the courtroom during an omnibus hearing when Hicks's advisory counsel requested a chambers conference. The court explained the closed courtroom as follows:

> Because Mr. Hicks is representing himself, we are not going to have chambers conferences in the usual way back in the judge's chambers. We will have to have them in open court. I am willing, however, if the matters are important enough, to close the courtroom for a brief period of time to have specifically the chambers conference, and then everything else will be [ … ] in open court.

The district court then asked Hicks if he would like the courtroom closed, and Hicks responded "[y]es." The bailiff cleared the courtroom, and the parties discussed providing Hicks with a court rule book and how to ensure that Hicks had ample time to review redactions in a transcript of his statement to investigators. Hicks also mentioned his motion for a continuance, which the state did not oppose. The par-

---

**2.** Hicks does not challenge two other courtroom closures because he concedes that nei-

ther party raised substantive trial issues during those closures.

ties then discussed scheduling the continued omnibus hearing and Hicks's access to legal materials. Hicks attempted to discuss his speedy trial request, but the district court stopped him stating, "[W]e are not going to do this in a chambers [conference]. We are going to do it in open court." After the courtroom was reopened, the district court summarized what the parties had discussed during the conference and then addressed the speedy trial request.

The district court also closed the courtroom twice during the trial. During the state's case, the prosecution sought to play a recording of Hicks's statements to investigators. The prosecution had a redacted transcript of the statement, but Hicks had not had an opportunity to review the transcript. The district court closed the courtroom so that the parties could discuss the best way to give Hicks adequate time to review the transcript. While the courtroom was closed, the prosecutor marked and offered, and the court received into evidence as a court exhibit, the redacted transcript. The district court opened the courtroom and stated that the parties discussed "some evidentiary issues in this case." The tape recording of Hicks's statement was then played in open court.

The district court closed the courtroom again during the defense's case to discuss the proposed testimony of a witness. Hicks subpoenaed one of his discharged public defenders to testify, and counsel requested a closed courtroom to discuss the waiving of Hicks's attorney-client privilege. Hicks's advisory counsel requested that Hicks waive his attorney-client privilege on the record and that Hicks's previous attorney be ordered to testify. After the courtroom was reopened, Hicks's advisory counsel made the same requests in open court, and Hicks waived the privilege.

Hicks claims that these closures violated his right to a public trial because the parties discussed "substantive issues related to the trial and to the case," including offering exhibits and discussing the potential testimony of Hicks's former lawyer. The state counters that these brief proceedings were administrative in nature and were the type of issues that counsel would discuss in chambers if Hicks had kept his appointed counsel.

We find the state's argument persuasive. The majority of Minnesota cases that discuss a defendant's right to a public trial involve closures during witness testimony, opening or closing statements, or jury instructions. *See, e.g., State v. Silvernail,* 831 N.W.2d 594, 601 (Minn.2013) (closure during state's closing argument); *Brown,* 815 N.W.2d at 618 (closure during jury instructions); *Bobo,* 770 N.W.2d at 139 (discussing closure during a witness's second testimony); *Mahkuk,* 736 N.W.2d at 683–85 (removal of gang members from courtroom during lay-witness testimony); *Lindsey,* 632 N.W.2d at 660–62 (discussing exclusion of two minors from the entire trial); *Fageroos,* 531 N.W.2d at 201 (discussing closure during testimony of two witnesses); *State v. Infante,* 796 N.W.2d 349, 355 (Minn.App.2011) (excluding defendant's sister and child during closing arguments); *State v. Cross,* 771 N.W.2d 879, 882 (Minn.App.2009) (discussing closure during sentencing hearing).

Here, the courtroom was not closed to the public during any witness testimony, opening or closing statements, jury instructions, or sentencing hearing. Hicks was present for all of the conferences that occurred in closed court and agreed to all these closures. The discussions during the closings involved routine administrative matters traditionally addressed during closed conferences in chambers, outside public view. Moreover, the challenged clo-

sures took up a very small portion of the trial proceedings, comprising only 23 of over 1500 transcript pages.

The transcript shows that the district court treated the pro se Hicks fairly during these discussions and was mindful of Hicks's right to a public trial. The district court carefully limited the scope and duration of the conferences, including ending a conference when Hicks attempted to discuss an issue that the district court believed should be handled in open court. The district court also provided explanations as to why it was closing the courtroom before it took such action and summarized what had been discussed during the closure after the district court reopened the courtroom. In addition, after the second courtroom closure, the district court made *Waller* findings on the record. The district court stated that brief closures were necessary to conduct a chambers conference with the defendant "because the defendant is in custody and pro se." It reasoned that holding these conferences in chambers would breach security protocol and that there were "no reasonable alternatives" to closing the courtroom to hold these brief conferences. Finally, it emphasized that all the conferences were recorded by a court reporter.

After carefully reviewing the transcript and the focus of these discussions when the district court briefly closed the courtroom, we conclude that these conferences involved matters too trivial to implicate Hicks's right to a public trial. *See Lindsey*, 632 N.W.2d at 660–61. We are well aware of the supreme court's direction that district courts should close courtrooms "carefully and sparingly," *Brown*, 815 N.W.2d at 618, and do not endorse the district court's practice. But under the circumstances present here, Hicks was not deprived of the protections of a public trial, and no structural error occurred.

## III. Upward Durational Departure

Hicks next claims that the district court abused its discretion by imposing an upward durational departure based on his concealment of J.R.'s body. Because we conclude that a murderer's successful concealment of a body can justify an upward departure for treating a victim with particular cruelty, we uphold Hicks's sentence.

We review a district court's decision to depart from the presumptive sentence for an abuse of discretion. *State v. Stanke*, 764 N.W.2d 824, 827 (Minn.2009). "Reversal is warranted if the reasons given for the departure are improper or inadequate." *Id.* Whether a particular reason for an upward departure is permissible is a question of law, which we review de novo. *Dillon v. State*, 781 N.W.2d 588, 595 (Minn.App.2010), *review denied* (Minn. July 20, 2010).

A district court may depart from the presumptive sentence if it articulates "identifiable, substantial, and compelling circumstances" to support the departure. Minn. Sent. Guidelines II.D (2007). "Substantial and compelling circumstances are those showing that the defendant's conduct was significantly more or less serious than that typically involved in the commission of the offense in question." *State v. Edwards*, 774 N.W.2d 596, 601 (Minn.2009) (quotation omitted). The Minnesota Sentencing Guidelines set forth "a nonexclusive list of reasons ... for departure." Minn. Sent. Guidelines, cmt. II.D.201 (2007).

One compelling circumstance that can support an upward durational departure is when a defendant treats a victim with particular cruelty. *Id.* at II. D.2.b.(2) (Supp.2007). Particular cruelty "involves the gratuitous infliction of pain and cruelty of a kind not usually associated with the commission of the offense in ques-

tion." *State v. Rourke*, 773 N.W.2d 913, 922 (Minn.2009) (quotations omitted). A defendant's concealment of the victim's body is considered particularly cruel. *State v. Shiue*, 326 N.W.2d 648, 654–55 (Minn.1982). Concealment is considered particularly cruel given the impact on family members both in terms of not knowing the victim's whereabouts and observing the victim's body in a deteriorated state. *See State v. Murr*, 443 N.W.2d 833, 837 (Minn.App.1989) (discussing the family's anguish over not knowing the victim's location for over seven weeks).

Here, concealment of J.R.'s body caused her family much additional pain and anguish because they did not know where she was or what had happened to her. J.R.'s body was not discovered for over three-and-one-half years after her disappearance. *See Shiue*, 326 N.W.2d at 655 (noting that for five months, the victim's family "suffered a great deal of trauma, not knowing whether their son was dead or alive"); *State v. Murr*, 443 N.W.2d 833, 837 (Minn.App.1989) (stating that concealment caused the victim's family "great anguish to be without knowledge of his whereabouts for more than seven weeks").

T.F., J.R.'s daughter, testified at Hicks's *Blakely* hearing that she distributed flyers about J.R. on the anniversary of her disappearance every year, until her body was discovered. When her mother was finally found, T.F. was not allowed to view her mother's body because of its deteriorated state. *See Murr*, 443 N.W.2d at 837 (noting the deterioration of the victim's body when discussing concealment as particularly cruel).

Citing the supreme court's decision in *State v. Leja*, Hicks argues that concealment alone cannot support an upward durational departure. 684 N.W.2d 442 (Minn.2004). We conclude, however, that *Leja* is inapplicable to the present case because it is factually and legally distinguishable.

In *Leja*, the defendant Leja invited the male victim to her boyfriend's apartment where Leja's boyfriend and another friend assaulted and murdered the victim. *Id.* at 443. The boyfriend and friend then dismembered the victim, and Leja assisted in disposing of his body. *Id.* For her role, a jury convicted Leja of aiding and abetting second-degree felony murder. *Id.* at 447. The district court increased Leja's sentence because she helped to conceal the victim's body. *Id.* The supreme court noted that it had affirmed departures that were based on multiple grounds, one of which was concealment of the body, but it had not affirmed a departure based solely on concealment. *Id.* at 448–49. The supreme court ultimately reversed the district court's sentence, holding that defendant's concealment of the victim's body "without more" did not support an upward durational departure. *Id.* at 450.

*Leja* is not controlling here for two reasons. First, in its analysis, the supreme court in *Leja* emphasized that the defendant was not the person who actually killed or dismembered the victim:

> The aggravating factor of particular cruelty looks to whether "[t]he victim was treated with particular cruelty for which the *individual offender* should be held responsible." Here, it is undisputed that Leja was more than an innocent bystander. But she was not the person who assaulted and shot [the victim] or dismembered his body.

*Id.* at 449 (citation omitted). The supreme court later reiterated that "it is critical that we specifically focus on Leja's conduct and her second-degree felony murder sentence and not be unduly distracted by the conduct" of the two men who committed the murder. *Id.* at 450. Here, in contrast

to *Leja*, Hicks acted alone when he murdered J.R. He then disposed of J.R.'s body by digging a shallow grave in a park and dumping her body there.

Second, the holding in *Leja* that concealment alone is not a sufficient basis for an upward departure did not command a majority of the supreme court. *See id.* at 452 (Anderson, J., concurring). Justice Anderson joined the majority on a separate ground, that the departure could not be based on conduct that was "never charged or if charged, was dismissed." *Id.* at 452.

▇▇▇ In sum, under applicable law and the circumstances of this case, we conclude that Hicks's concealment of J.R.'s body was particularly cruel and justifies an upward departure. "A finding that the victim was treated with particular cruelty alone [is] enough to justify the departure because that factor is specifically included as an aggravating factor justifying an upward departure in the Minnesota Sentencing Guidelines." *State v. Folkers*, 581 N.W.2d 321, 327 (Minn.1998). Therefore, the district court did not abuse its discretion by imposing an upward departure based on the aggravating factor of particular cruelty.

### Separate Offense

▇▇▇ Alternatively, Hicks argues that concealment cannot support a departure because it is a separate offense of interference with a dead body. Specifically, Hicks cites Minnesota Statutes section 609.502, subdivision 1 (2006), which states that "[w]hoever interferes with the body or scene of death with intent to mislead the coroner or conceal evidence is guilty of a gross misdemeanor." Hicks is correct that "[d]epartures cannot be based on uncharged or dismissed offenses." *State v. Jones*, 745 N.W.2d 845, 849 (Minn. 2008). But this rule was later limited to

prohibiting upward durational departures on "uncharged *lesser-included* [offenses]." *Edwards*, 774 N.W.2d at 606 (emphasis added). Interference with a dead body is not a lesser-included offense of second-degree felony murder. Thus, the gross misdemeanor does not prohibit an upward durational departure on Hicks's murder conviction.

### IV. Hicks's Pro Se Arguments

*Admission of Evidence*

▇▇▇ In his pro se supplemental brief, Hicks first contends that the district court erred by admitting into evidence a certified copy of the district court's legal declaration of death, which was issued before discovery of J.R.'s body. Hicks did not object at trial to admitting the exhibit; we therefore review the exhibit's admission for plain error. *See State v. Irby*, 820 N.W.2d 30, 38 (Minn.App.2012), *review granted on other grounds* (Minn. Nov. 20, 2012). "Under plain error analysis, we must determine whether there was error, that was plain, and that affected the defendant's substantial rights." *State v. Kuhlmann*, 806 N.W.2d 844, 852 (Minn.2011).

▇▇▇ Hicks specifically challenges the conclusion in the declaration that J.R. died in her apartment, based on the amount of blood that investigators discovered. But he fails to show prejudice because he does not demonstrate how establishing J.R.'s apartment as the venue of her murder affected his substantial rights. *See State v. Griller*, 583 N.W.2d 736, 741 (Minn.1998) (stating that the "defendant bears the burden of persuasion on this third prong" and that appellate courts "consider this to be a heavy burden").

*Sufficiency of the Evidence*

▇▇▇ Hicks next argues that the evidence was insufficient to prove that he

killed the victim because he gave consistent statements to the police, the state's evidence did not rule out other suspects, and little physical evidence supported his conviction.

Hicks misrepresents the record, and his arguments are not adequately supported. First, Hicks's statements to the police were not consistent. As discussed above, Hicks substantially changed his story between the first and second interviews with the police. Second, as demonstrated by the district court's findings of fact, the state's evidence ruled out two other possible suspects. The district court found that the testimony of these two potential suspects was credible and believable when they testified that they were not involved with J.R.'s murder. Hicks does not challenge the district court's credibility findings. *See State v. Butcher*, 563 N.W.2d 776, 780 (Minn.App.1997) (stating that issues not adequately briefed on appeal are waived), *review denied* (Minn. Aug. 5, 1997). Finally, Hicks contends that no physical evidence connected him with J.R.'s death. This assertion misstates the record because the state proved that the bloody shoeprint in J.R.'s hallway matched the tread of Hicks's shoes and that the shoes had human blood on them.

## DECISION

We affirm Hicks's conviction because the district court did not violate the Minnesota Code of Judicial Conduct by making a factual determination on voice recognition in the court trial. Nor did the district court violate Hicks's Sixth Amendment right to a public trial when it closed the courtroom for three brief conferences to deal primarily with administrative matters with a pro se defendant. We also affirm Hicks's sentence because his concealment of J.R.'s body was sufficient to support an upward durational departure.

**Affirmed.**