*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0252**

State of Minnesota,
Respondent,

vs.

Jeffery Dale Trevino,
Appellant.

**Filed March 30, 2015
Affirmed
Bjorkman, Judge**

Ramsey County District Court
File No. 62-CR-13-1455

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, Minnesota (for respondent)

John C. Conard, Hellmuth & Johnson PLLC, Woodbury, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Johnson, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant challenges his felony-murder conviction and sentence, arguing that (1) the district court abused its discretion in instructing the jury on circumstantial

evidence, (2) the evidence is insufficient to sustain his conviction, (3) third-degree assault cannot serve as the predicate felony for his conviction, and (4) the district court erred as a matter of law by imposing an aggravated sentence based solely on concealment of a body. We affirm.

## FACTS

In early 2013, appellant Jeffery Trevino and his wife Kira Steger were experiencing marital difficulties and were discussing separation or divorce. Steger also was spending a significant amount of time away from home and had begun an intimate relationship with another man, R.W.

On Thursday, February 21, Trevino and Steger met for dinner and bowling at the Mall of America, where Steger managed a clothing store. Steger exchanged text messages with R.W. throughout the evening. Afterward, Trevino and Steger returned to the house they rented on East Iowa Avenue in St. Paul. They began watching a movie around 10:00 p.m. At one point, their downstairs roommate, M.R., walked in and saw Trevino and Steger watching the movie, and then went to bed. Steger texted R.W. one last time at 11:44 p.m.

Throughout the night, a neighbor's security camera recorded activity in and around Trevino and Steger's home. Around 12:45 a.m., a light came on in the portion of the home that Trevino and Steger inhabited. Roughly a half hour later, the inside light was off and the light over the driveway came on. Within five minutes, the driveway light turned back off and the inside light came on again, remained on for more than 15 minutes, then went off. Around 2:00 a.m., Trevino drove Steger's white Chevy Cobalt to

2

a nearby gas station, where a security camera recorded him filling the gas tank. He turned out of the gas station in the direction of I-35E, rather than driving directly home. The neighbor's security camera did not record Trevino's return, but the light inside the house went on again briefly around 4:15 a.m. No further activity was recorded until after sunrise.

Shortly after 8:00 a.m. on Friday, February 22, Trevino drove his own vehicle to the same gas station, where he purchased gas and withdrew cash from the ATM. Security footage showed Trevino wearing a dark hooded sweatshirt with a white design on the front and that he left the station in the direction of his home.

Around 9:15 a.m., Steger's car left the home and proceeded down Iowa Avenue; roughly a half hour later, a white car indistinguishable from Steger's entered the West parking ramp at the Mall of America. Shortly before 10:00 a.m., a taxi at the mall picked up a thin man in a hooded sweatshirt who asked to be taken to 424 East Iowa Avenue— an address that does not exist. The driver transported the man to Iowa Avenue and let him off just east of Trevino and Steger's residence at around 10:40 a.m. The passenger paid the $35 fare in cash. Moments later, a thin person in a dark hooded sweatshirt with a white design on the front walked westward down Iowa Avenue and up the driveway to Trevino and Steger's residence.

On Saturday, February 23, Steger was scheduled to work at 2:00 p.m. She did not report for her shift or call in, and her cell phone was off when a coworker tried to reach her; both were unusual for Steger. Trevino spoke with Steger's friends about her absence, including asking a police officer friend of hers if he should report her missing,

3

but he did not ask Steger's family about her whereabouts.  The following morning, after Steger again failed to report for work, Trevino contacted the police.  He then called Steger's mother and told her that he had filed a missing-person report.

Police interviewed Trevino at home on Sunday, February 24.  He stated that Steger had slept at home Thursday night, she left around 9:00 a.m. the next morning to go to the gym, and he had not heard from her since.  Police subsequently learned that Steger had not been to the gym or used her cell phone since February 21.

On Monday, February 25, Steger's car was discovered in the West parking ramp at the Mall of America.  It had been ticketed by mall security at 3:56 a.m. on Saturday, February 23.  Police found Steger's blood in the trunk and on a trunk liner discovered on an embankment near the car.  In the passenger compartment, police found a self-help divorce form and many of Steger's personal effects, but no cell phone, driver's license, credit cards, or checkbook.

That same day, police searched Trevino and Steger's home.  In the master bedroom, they noticed signs that furniture had been moved and numerous apparent blood stains; subsequent testing revealed little confirmed blood but definitively matched several areas of confirmed blood to Steger's DNA profile.  Police also collected the Arkansas Razorbacks sweatshirt that Trevino wore to dinner on February 21, which had been washed and air dried, and a black hooded Ecko Unltd. sweatshirt with a white design on the front; subsequent testing did not reveal blood on either item.

4

Police arrested Trevino on February 26. Trevino was charged with second-degree intentional murder and second-degree felony murder. He remained in custody as police continued to investigate and Steger's family searched for her body.

On March 16, Steger's grandfather found a plastic bag containing several bloody clothing items and a bloody pillow in a brushy area near Keller Lake in Maplewood; subsequent testing matched the blood on the pillow to Steger's DNA profile. Two weeks later, Steger's driver's license was found within a few miles of Trevino and Steger's home. And on May 8, Steger's body was discovered in the Mississippi River near the St. Paul dock.

Ramsey County Chief Medical Examiner Michael McGee, M.D., performed an autopsy. Dr. McGee noted that the body was in an advanced state of decomposition and had been in the water for a long time. He used dental records to identify the body as Steger's. Dr. McGee identified three traumatic injuries that preceded and led to Steger's death, though he could not determine the order in which they were sustained. First, Steger had an incision wound on the left side of her forehead, one centimeter deep and four centimeters long, which Dr. McGee opined was caused by a sharp-edged instrument. A living person with such a wound would bleed profusely, though the bleeding would stop once the person was close to death. Second, Steger suffered a broken left index finger, which likely occurred as the finger was hyperextended "during the give-and-take of an assault." Third, Steger had a v-shaped laceration between her nose and lip and corresponding internal injuries to both lips. The injuries could have been caused by someone punching Steger while wearing a ring, but "it wouldn't have been very hard

5

because the teeth were not loosened." Dr. McGee believed it more likely that these injuries were caused by smothering with a hand or pillow. Dr. McGee concluded that Steger died "as a result of an assault on her causing the injuries that are present."

To determine time of death, Dr. McGee collected and examined the contents of Steger's stomach and obtained information about the timing and contents of Steger's last known meal—her dinner with Trevino on February 21, which ended around 7:30 p.m. Dr. McGee found the fish, nut, and vegetable elements of that meal in Steger's stomach, but the meat and rice elements were no longer present. Dr. McGee did not see any of the meal in the lower portions of Steger's gastrointestinal tract. And while digestion rates vary significantly from person to person and depend on the amount and type of food consumed, scientific literature indicates that an adult generally digests a meal completely, emptying the stomach, in as little as one to two hours or up to "11 hours and some minutes."

After a nine-day trial, a jury acquitted Trevino of second-degree intentional murder but found him guilty of second-degree felony murder. He moved for acquittal, arguing that, as presented in this case, third-degree assault is not a proper predicate offense for a charge of second-degree felony murder. The district court denied the motion and entered judgment of conviction.

The state sought an upward departure from the presumptive sentencing range of 128-180 months' imprisonment based on particular cruelty, arguing that Trevino concealed Steger's body to avoid detection, which caused her family anguish. Trevino waived his right to a sentencing jury and stipulated that if he concealed or attempted to

6

conceal Steger's body, it would cause anguish to her family. He further agreed that those facts would justify an aggravated sentence, but argued that concealment alone does not provide a sufficient legal basis to depart. The district court found that Trevino treated Steger with particular cruelty "in that he concealed her body in an attempt to evade detection further causing extreme anguish for the victim's family." Based on that determination, the district court sentenced Trevino to 330 months' imprisonment. Trevino appeals.

## DECISION

### I. The district court did not abuse its discretion in instructing the jury on circumstantial evidence.

A district court has broad discretion in determining how to instruct a jury. *Gulbertson v. State*, 843 N.W.2d 240, 247 (Minn. 2014). We will not reverse when jury instructions, viewed as a whole, fairly and accurately state the law in a manner that the jury can understand. *State v. Scruggs*, 822 N.W.2d 631, 642 (Minn. 2012). Instructional error warrants reversal "only if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *State v. Koppi*, 798 N.W.2d 358, 364 (Minn. 2011) (quotation omitted).

Trevino argues that the district court abused its discretion by denying his request for the following instruction on circumstantial evidence:

> A fact may be proven by either direct or circumstantial evidence, or by both. The law does not prefer one form of evidence over the other. *However, if you believe that the evidence in this case is solely circumstantial, the circumstances proved and the reasonable inferences from such evidence must be consistent only with the defendant's*

7

> *guilt and inconsistent with any rational hypothesis except that of his guilt.*

(Emphasis added.) The district court instead read only the first two sentences to the jury, consistent with the pattern jury instruction, 10 *Minnesota Practice*, CRIMJIG 3.05 (5th ed. 2014). Trevino argues that the additional rational-hypothesis instruction is necessary to explain circumstantial evidence fairly and accurately. *See, e.g.*, *State v. Andersen*, 784 N.W.2d 320, 337 (Minn. 2010) (Meyer, J., concurring). We are not persuaded.

Our supreme court has repeatedly approved the CRIMJIG 3.05 instruction as an accurate statement of the law on circumstantial evidence and held that a district court is not required to give an additional rational-hypothesis instruction, particularly when, as here, the defendant does not object to the reasonable-doubt instruction. *See State v. Gassler*, 505 N.W.2d 62, 68 (Minn. 1993) (citing *State v. Turnipseed*, 297 N.W.2d 308 (Minn. 1980)). The *Gassler* court explained that jury instructions and standards for reviewing the sufficiency of the evidence supporting a jury's verdict are conceptually different. *Id.* And it echoed the reasoning of the United States Supreme Court that "the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." *Id.* (quoting *Holland v. United States*, 348 U.S. 121, 139-40, 75 S. Ct. 127, 137 (1954)).

We need not decide whether a district court *may* give a rational-hypothesis instruction, as Trevino urges, because the jury instructions the district court gave fairly and accurately explain circumstantial evidence. On this record, we conclude the district

8

court did not abuse its discretion by denying Trevino's request for an additional rational-hypothesis instruction.

**II.    The evidence is sufficient to sustain Trevino's conviction.**

When reviewing a sufficiency-of-the-evidence challenge, we carefully examine the record evidence to determine whether the fact-finder could reasonably find the defendant guilty of the charged offense. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). When a conviction is based on circumstantial evidence, we use a two-step process. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). We first identify the circumstances proved—the evidence supporting the jury's guilty verdict. *Id.* We then independently examine the reasonableness of the inferences the jury could draw from those circumstances. *Id.* at 599. "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002).

The evidence that Trevino committed the crime is wholly circumstantial, and there are multiple ways to interpret almost all of that evidence. But it is not this court's role to weigh the evidence, even in circumstantial-evidence cases. *State v. Stein*, 776 N.W.2d 709, 714 (Minn. 2010). "[T]he jury is in the best position to evaluate the credibility of the evidence," and it has already done so. *See State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). Accordingly, when determining the circumstances proved, we "assume that the jury resolved any factual disputes in a manner that is consistent with the jury's verdict." *Id.* "There may well be testimony on behalf of the defendant as to inconsistent facts and

9

circumstances, not conclusively proved, and which the jury may have a right to and do reject as not proved." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008) (quotation omitted). But we consider "only those circumstances that are consistent with the verdict." *Silvernail*, 831 N.W.2d at 599.

Viewed in the light most favorable to the verdict, the evidence adduced at trial establishes the following circumstances. Steger ate her last meal before 7:30 p.m. on Thursday, February 21. She was alive until at least 11:44 p.m. that night, during which time she digested, and perhaps eliminated, a portion of her meal. But at some point before she finished digesting, likely well before 6:30 a.m. the following morning, Steger was assaulted and killed, and her body was dumped in the Mississippi River. Trevino was the only person with Steger during this time frame.

The circumstances proved include conduct by Trevino that is consistent with disposing of Steger's body and her car. Around 2:00 a.m., Trevino took Steger's car to the gas station. Instead of returning directly home, he turned in the direction of the freeway, and there was no sign of anyone in the residence until around 4:15 a.m. Less than four hours later, Trevino returned to the same gas station in his own car, now wearing his black Ecko Unltd. hooded sweatshirt, and withdrew cash. This time, he drove directly home. Around 9:15 a.m., someone drove Steger's white Chevy Cobalt down Iowa Avenue. Within the next half hour, someone drove a white Chevy Cobalt into the West parking garage at the Mall of America where Steger's car—that contained her blood—was found. A man matching Trevino's general description hailed a taxi from the mall and gave a fake address on Iowa Avenue. The passenger paid in cash, and

10

moments later, someone wearing a sweatshirt indistinguishable from Trevino's Ecko Unltd. sweatshirt walked down Iowa Avenue directly to Trevino and Steger's home.

And the circumstances proved include Trevino's conduct between February 22 and his arrest on February 26 that points toward guilt. He forged a check from Steger's account and mailed it to their landlord on February 22, roughly one week ahead of when Trevino and Steger typically paid rent. On February 23, he contacted their landlord, gave notice that they would be moving out April 1, and immediately began cleaning the house but not packing. After Steger missed a scheduled shift at work and was uncharacteristically unavailable by phone, Trevino spoke with several of her friends about her whereabouts but did not contact her family. He contacted her mother only after filing a missing-person report. During a February 24 telephone call with Steger's sister, he referred to Steger in the past tense. And Trevino wrote down R.W.'s address and put it in his vehicle, though the two men had never met. Viewed as a whole, these circumstances not only indicate that Trevino knew Steger was dead but also suggest that jealousy over her affair with R.W. was his motive for the assault that led to her death.

We next consider whether the reasonable inferences that can be drawn from the circumstances proved are only consistent with guilt. *State v. Al–Naseer*, 788 N.W.2d 469, 474 (Minn. 2010). If, as here, the reasonable inferences are consistent with guilt, we consider whether they are also consistent with other hypotheses. *Id.* But competing hypotheses must be based on more than mere "conjecture" or "possibilities of innocence." *State v. Asfeld*, 662 N.W.2d 534, 544 (Minn. 2003) (quotations omitted). It is the defendant's burden to point to evidence in the record that is consistent with a

11

rational theory other than guilt. *Taylor*, 650 N.W.2d at 206. Reversal is not warranted if the evidence, taken as a whole, makes the defendant's theories seem unreasonable. *Id.*

Trevino argues that some evidence adduced at trial—and the lack of certain evidence—supports a reasonable inference that Steger "was killed outside the home by someone else." He argues that if he killed Steger in their bedroom the night of February 21, it stands to reason that someone would have heard her scream and police would have discovered more of Steger's blood in the bedroom and on the clothes Trevino wore to dinner that night. Trevino also contends that Dr. McGee's testimony that he saw no evidence of Steger's last meal in her lower gastrointestinal tract is inconsistent with the state's theory that Steger's death interrupted her digestion. And Trevino cites evidence that Steger's cell phone was activated and sold overseas in March, while he was incarcerated. Certain aspects of this evidence—such as the cell-phone activation—do not support the jury's verdict and are thus not part of the circumstances proved from which we draw inferences. But more importantly, Trevino presents us with no more than isolated facts to support his alternative-perpetrator theory. *See Silvernail*, 831 N.W.2d at 599 (requiring review of circumstantial evidence "not as isolated facts, but as a whole").

Viewed in light of all of the circumstances proved, Trevino's theory requires a host of improbable factual circumstances: Trevino drove Steger's car to the gas station at 2:00 a.m. Friday morning simply because he knew she needed gas. She left for the gym around 9:00 a.m. that morning without eating or once using her phone. But before she could get to the gym, some unknown person assaulted and killed her in broad daylight, placed her bloody body in the trunk of her car, and at some point deposited her body in

the Mississippi River. The killer also abandoned Steger's driver's license and various bloody personal effects within one or two miles of her residence but drove her car to the public parking garage of her workplace, roughly a half hour's drive away, and left it in time for it to be ticketed by mall security at 3:56 a.m. on Saturday. And even if *all* of these circumstances came to pass, they do not explain the numerous examples of suspicious conduct that Trevino exhibited in the days before his arrest.

Our thorough consideration of the record as a whole leads us to only one reasonable conclusion: late February 21 or early February 22, Trevino assaulted his wife, inflicting multiple sharp- and blunt-force injuries that ultimately caused her death. Accordingly, Trevino's challenge to the sufficiency of the evidence fails.

## III. The district court properly convicted Trevino of second-degree felony murder based on the predicate offense of third-degree assault.

Trevino argues that his felony-murder conviction cannot be predicated on third-degree assault because (1) the state did not properly plead it as the predicate offense for the felony-murder charge and (2) third-degree assault does not pose a special danger to human life. We address each argument in turn.

### Pleading

Due process requires that "an accused . . . be adequately apprised of the charge made against him in order that he may prepare his defense." *State v. Pratt*, 277 Minn. 363, 366, 152 N.W.2d 510, 513 (1967). To satisfy this requirement, a complaint need only present the essential facts establishing probable cause to believe that an offense has been committed and that the defendant committed it. Minn. R. Crim. P. 2.01, subd. 1. A

complaint "alleging a statutory offense is sufficient if the language used spells out all essential elements in a manner which has substantially the same meaning as the statutory definition." *Pratt*, 277 Minn. at 365, 152 N.W.2d at 512. "[I]t is unnecessary to identify each specific element of the crime." *State v. Dunson*, 770 N.W.2d 546, 551 (Minn. App. 2009), *review denied* (Minn. Oct. 20, 2009). When a defendant objects to the sufficiency of the complaint for the first time after conviction, we will not reverse unless close examination of the entire record reveals that the defect was so substantial that it "misled the defendant as to the nature of the offense charged to the prejudice of his substantial rights." *Pratt*, 277 Minn. at 366, 152 N.W.2d at 513.

The amended complaint filed after Steger's body was recovered states a charge (unchanged from the original) of second-degree felony murder and the following factual allegations bearing on the underlying felony: Police found Steger's blood in the home, in the trunk of her car, and on a pillow discovered near the home. The autopsy revealed that Steger suffered a laceration just above her left eye, an injury to her upper lip, and a broken index finger.

Trevino did not challenge the sufficiency of the amended complaint. Nor did he object to the jury instructions expressly identifying third-degree assault as the predicate felony. And the state's case against Trevino, from Dr. McGee's testimony and autopsy photographs to the prosecutor's opening statement and closing argument, consistently described the murder as a violent, multi-faceted assault that led to Steger's death. Trevino thoroughly cross-examined Dr. McGee about the nature and likely cause of Steger's injuries. Because nothing in this record indicates that Trevino was misled about

14

the nature of the offense with which he was charged, we reject Trevino's due-process argument.

### Special danger to human life

A person is guilty of second-degree felony murder when he "causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense." Minn. Stat. § 609.19, subd. 2(1) (2012). To serve as a predicate-felony offense, the offense must involve a "special danger to human life." *State v. Smoot*, 737 N.W.2d 849, 851 (Minn. App. 2007), *review denied* (Minn. Nov. 21, 2007). The elements of the predicate felony need not refer to death or bodily harm so long as they demonstrate that the offense is "inherently dangerous and poses a significant danger to human life." *Id.* We consider "both the elements of the predicate felony in the abstract and the totality of the circumstances in determining whether the predicate felony involves a special danger to human life." *State v. Anderson*, 666 N.W.2d 696, 700 (Minn. 2003). Whether a particular offense is a proper predicate for felony murder is a question of law, which we review de novo. *Id.* at 698.

A person is guilty of third-degree assault if they assault another person, inflicting "substantial bodily harm." Minn. Stat. § 609.223, subd. 1 (2012). Both our supreme court and this court have concluded that crimes against persons usually present special danger to human life in the abstract. *See State v. Cole*, 542 N.W.2d 43, 53 (Minn. 1996) (holding that second-degree assault "forms a proper predicate felony to a felony murder conviction" because "assault is not a property crime, but a crime against the person"); *Smoot*, 737 N.W.2d at 853 (holding that felony DWI poses a special danger to human life

15

in the abstract); *State v. Mitchell*, 693 N.W.2d 891, 895 (Minn. App. 2005) (holding that felony child neglect or endangerment poses a special danger to human life in the abstract), *review denied* (Minn. June 28, 2005). The level of violence present in a third-degree assault—resulting in substantial bodily harm—easily meets the danger-to-human-life threshold in the abstract.

Trevino urges us to disregard the level of harm involved, arguing that third-degree assault poses no greater danger to human life than misdemeanor assault because the two offenses require only the same general intent. *See State v. Fleck*, 810 N.W.2d 303, 309-10 (Minn. 2012) (holding that assault-harm is a general-intent crime). We are not persuaded. When determining whether an offense involves a special danger to human life, our focus is on the actor's conduct, not his intent. *See Smoot*, 737 N.W.2d at 854 (holding that predicate offense need not include a specific mens rea element). The conduct of causing another person substantial bodily harm presents a special danger to human life, regardless of whether the actor intends to cause that level of harm. Accordingly, we conclude that third-degree assault involves a special danger to human life in the abstract.

Likewise, we are persuaded that the particular third-degree assault committed here posed a special danger to human life. Trevino seeks to minimize the nature of the assault by focusing solely on Steger's broken finger. But the evidence amply establishes that Trevino also cut Steger's forehead to the bone, likely causing profuse bleeding, and either punched her in the mouth or smothered her with his hand or a pillow. Any of these acts poses an unmistakable danger to human life.

16

On this record, we conclude the district court did not err by convicting Trevino of second-degree felony murder based on the predicate offense of third-degree assault.

**IV.**     **The district court did not abuse its discretion by imposing an aggravated sentence based on Trevino's concealment of Steger's body.**

The decision to depart from a presumptive sentence is within the district court's discretion. *State v. Stanke*, 764 N.W.2d 824, 827 (Minn. 2009). A district court must impose the presumptive sentence unless there are "identifiable, substantial, and compelling circumstances" to warrant an upward departure. Minn. Sent. Guidelines 2.D.1 (2012). "Substantial and compelling circumstances are those showing that the defendant's conduct was significantly more or less serious than that typically involved in the commission of the offense in question." *State v. Edwards*, 774 N.W.2d 596, 601 (Minn. 2009) (quotation omitted). This court will reverse only if the district court's reasons for departure are improper or there is insufficient evidence on which to base a departure. *State v. Vance*, 765 N.W.2d 390, 395 (Minn. 2009).

Treatment of a victim with particular cruelty is a recognized basis for departure. Minn. Sent. Guidelines 2.D.3.b(2). "[P]articular cruelty involves the gratuitous infliction of pain and cruelty of a kind not usually associated with the commission of the offense in question." *Tucker v. State*, 799 N.W.2d 583, 586 (Minn. 2011) (quotations omitted). A defendant's concealment of the victim's body has been considered particularly cruel, especially when the defendant affirmatively uses the concealment to his advantage or the concealment results in disfigurement of the victim's body or further anguish to the

17

victim's family. *State v. Shiue*, 326 N.W.2d 648, 654-55 (Minn. 1982); *State v. Murr*, 443 N.W.2d 833, 837 (Minn. App. 1989), *review denied* (Minn. Sept. 27, 1989).

Trevino argues that concealment of a body does not constitute particular cruelty in the absence of an attempt to bargain with authorities. Trevino also asserts that concealment cannot be a basis for departure because it constitutes the separate uncharged offense of interference with a body. We rejected identical arguments in *State v. Hicks*, 837 N.W.2d 51, 62-64 (Minn. App. 2013), *review granted* (Minn. Nov. 12, 2013), concluding that a murderer's concealment of his victim's body may constitute the aggravating factor of particular cruelty and does not constitute an uncharged lesser-included offense of second-degree felony murder. *Hicks* is consistent with the legislature's recognition that a murder victim's family members are also victims of that crime. *See* Minn. Stat. § 611A.01 (2012) ("The term 'victim' includes the family members, guardian, or custodian of a . . . deceased person."). While Trevino disagrees with that decision, it is the controlling law unless and until our supreme court holds otherwise. *See State v. Peter*, 825 N.W.2d 126, 129 (Minn. App. 2012), *review denied* (Minn. Feb. 27, 2013).

Moreover, we observe that the district court's particular-cruelty determination was not, as Trevino asserts, based solely on the concept of concealing a body. Rather, the district court expressly found that Trevino's actions were particularly cruel in light of the following facts. Trevino sought to evade detection by concealing Steger's body in the Mississippi River and staging her death as a kidnapping. To accomplish this, Trevino transported her body in the trunk of her car and used her friends to look for her. Her

body remained in the river, and her whereabouts were unknown, for more than two months. During that time, Steger's family and friends experienced the anguish of searching unsuccessfully for her body and discovering evidence containing Steger's blood. By the time Steger's body was discovered, it was deteriorated to the point of being unidentifiable without forensic testing and dental-record comparison. Steger's family experienced further distress at observing her body in this state. These unchallenged factual findings support the district court's assessment that Trevino acted with particular cruelty for which he should be held responsible. Accordingly, we conclude that the district court did not abuse its discretion in imposing an aggravated sentence.

**Affirmed.**