STATE OF MINNESOTA

IN SUPREME COURT

A12-1107

Court of Appeals                                                    Dietzen, J.
                                          Dissenting, Wright and Page, JJ.

State of Minnesota,

                    Respondent,

                                                    Filed:  June 3, 2015
vs.                                            Office of Appellate Courts

Mo Savoy Hicks,

                    Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

The district court may use the defendant's concealment of the victim's body as an aggravating factor to justify an upward durational departure from the presumptive sentence for homicide offenses.

Affirmed.

1

O P I N I O N

DIETZEN, Justice.

This case presents the question of whether the district court may use the defendant's concealment of the victim's body as an aggravating factor to justify an upward durational departure from the presumptive sentence for a homicide offense. Appellant Mo Savoy Hicks was convicted of second-degree unintentional murder for the death of Judy Rush. After Hicks waived his right to a sentencing jury, the district court imposed a 420-month sentence, which is an upward durational departure of 168 months. The court concluded that disposal and concealment of the victim's body constituted particular cruelty. The court of appeals affirmed Hicks's sentence. Because concealment of a murder victim's body is an aggravating factor on which a district court may base an upward departure, we affirm the court of appeals.

On August 22, 2007, Judy Rush's sister reported that Rush was missing. Police went to Rush's apartment to check on her. They entered the apartment and found blood stains in the living room, hallway, and bedroom. The next day, the police executed a search warrant at the apartment. The officers saw what appeared to be blood on the rug, floor, mattress, and bedroom walls. On August 28, 2007, the Anoka County Medical Examiner determined that Rush could not have survived after she lost the volume of blood discovered in her apartment. In late July 2008, the court declared Rush legally dead.

2

At the time of Rush's disappearance, Rush and Hicks were friends. The police spoke to Hicks about Rush on several occasions. He gave conflicting stories about being with Rush on the day police believed she was murdered.

Nearly 3 years after Rush's disappearance, human remains were discovered buried in a shallow grave in a park in Brooklyn Park. DNA analysis identified the remains as Rush. After examining her skeletal remains, a medical examiner determined that Rush had died as the result of a blunt force cranial injury.

Respondent State of Minnesota charged Hicks with second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2014), and second-degree unintentional murder, Minn. Stat. § 609.19, subd. 2(1) (2014). Hicks waived his right to a jury trial. He also waived his right to counsel and represented himself at trial.

During the court trial, the State presented physical evidence connecting Hicks to Rush's murder. In addition, two people with whom Hicks had been incarcerated at the Anoka County Jail testified that Hicks told them that he had hit Rush on the head with a "steel" or a hammer and then buried her near a place where Hicks used to live. The district court found Hicks guilty of second-degree unintentional murder but acquitted him of second-degree intentional murder.

Prior to trial, the State gave written notice that it intended to seek an upward durational sentencing departure. Its stated reasons for the departure included that the victim was treated with particular cruelty and that the victim's body was concealed. At the sentencing hearing, the State indicated that these two reasons for a departure "dovetail together" and "really go kind of hand and foot" because some appellate decisions

3

mention concealment of a body as an aggravating factor while others "have stated that concealment is a form of particular cruelty." After consulting with standby counsel about his right to a sentencing jury, Hicks signed a written waiver of his right to a sentencing jury and orally waived that right at the sentencing hearing.

Rush's daughter testified at the sentencing hearing. She described the lengthy search for her mother and the grief her family experienced. She testified that it was especially difficult not having her mother's body because she felt no closure, often holding on to hope that her mother might be alive. She explained that she went to several parks with a shovel and dug in places where the ground had recently been disturbed in the hope of finding her mother's remains, and inadvertently disturbed the remains of pets that people had buried, which troubled her.

Rush's daughter testified that the family held two funerals for Rush—one after she was declared legally dead and a second after her remains were located. The second funeral was delayed by many months because the medical examiner needed the help of a forensic anthropologist to determine the cause of Rush's death due to the decomposed state of the body. This delay caused the daughter additional grief and trauma; she was forced to wait to be with and say goodbye to her mother while her mother's remains were in multiple locations being studied by different people who were trying to determine how she died.

The district court found, in part, that the State proved "beyond a reasonable doubt that the disposal and concealment of Judy Rush's body constitutes particular cruelty under the facts." The court granted the State's request for an upward durational

departure. It sentenced Hicks to 420 months in prison, which was an upward durational departure of 168 months. *See* Minn. Sent. Guidelines IV (2007) (listing 252 months as the longest presumptive sentence for second-degree unintentional murder for a defendant with a criminal history score of four).

Hicks appealed both his conviction and sentence. The court of appeals affirmed. *State v. Hicks*, 837 N.W.2d 51, 55 (Minn. App. 2013). With respect to his sentence, the court concluded that "[o]ne compelling circumstance that can support an upward durational departure is when a defendant treats a victim with particular cruelty" and that "[a] defendant's concealment of the victim's body is considered particularly cruel." *Id.* at 62-63. It further reasoned that the fact that Hicks's concealment of Rush's body could constitute a separate, uncharged offense did not preclude the use of that fact to justify an upward durational departure. *Id.* at 64. We granted review on the issue of Hicks's aggravated sentencing departure.

I.

Hicks argues that the district court abused its discretion in imposing a 420-month executed sentence, which is an upward durational departure of 168 months. Specifically, Hicks contends that concealing a murder victim's body is not an aggravating factor upon which a district court may base an upward departure. According to Hicks, concealing a murder victim's body amounts to a separate uncharged offense that is not a valid basis for a sentencing departure.

We review a district court's decision to depart from the presumptive guidelines sentence for an abuse of discretion. *Tucker v. State*, 799 N.W.2d 583, 585-86 (Minn.

5

2011).  "If the reasons given for an upward departure are legally permissible and factually supported in the record, the departure will be affirmed.  But if the district court's reasons for departure are 'improper or inadequate,' the departure will be reversed."  *State v. Edwards*, 774 N.W.2d 596, 601 (Minn. 2009) (quoting *State v. Jackson*, 749 N.W.2d 353, 357 (Minn. 2008)).

The Minnesota Sentencing Guidelines promote uniformity, proportionality, and predictability in sentencing.  *State v. Misquadace*, 644 N.W.2d 65, 68 (Minn. 2002).  The guidelines permit departures from the presumptive sentence, but a court departing from the guidelines must articulate "substantial and compelling" circumstances justifying the departure.  *See Jackson*, 749 N.W.2d at 360; Minn. Sent. Guidelines 2.D.1.  " 'Substantial and compelling circumstances are those demonstrating that the defendant's conduct in the offense of conviction was significantly more or less serious than that typically involved in the commission of the crime in question.' "  *Tucker*, 799 N.W.2d at 586 (emphasis omitted) (quoting *State v. Jones*, 745 N.W.2d 845, 848 (Minn. 2008)).  The guidelines contain a "nonexclusive list of factors that may be used as reasons for departure."  Minn. Sent. Guidelines 2.D.3.  One of the aggravating factors listed in the guidelines is that "[t]he victim was treated with particular cruelty for which the individual offender should be held responsible."  Minn. Sent. Guidelines 2.D.3.b.(2).  We have occasionally recognized new aggravating factors that are not included in the list of aggravating factors in the guidelines.  *See, e.g.*, *State v. Morales*, 324 N.W.2d 374, 377 (Minn. 1982) (upholding upward durational sentencing departure when the defendant "invaded the zone of privacy which surrounded [the victim's] home"); *State v. Profit*, 323

6

N.W.2d 34, 36 (Minn. 1982) (upholding upward durational sentencing departure because the offense was committed at a daycare in front of children).[1]

A.

To answer the question presented, we will first review our existing case law to determine whether concealment of a homicide victim's body is a legally permissible basis for departure under the sentencing guidelines. Generally, the district court may impose an upward durational sentencing departure if the evidence shows that the defendant committed the offense in a particularly serious way. *Tucker*, 799 N.W.2d at 586. But the court may not do so "if the sentence will unfairly exaggerate the criminality of the defendant's conduct, or punish a defendant twice for the same conduct." *Edwards*, 774 N.W.2d at 601.

We have considered whether the concealment of a body is an aggravating factor that supports an upward sentencing departure in four cases. *State v. Griller*, 583 N.W.2d 736, 738-39, 744 (Minn. 1998); *State v. Folkers*, 581 N.W.2d 321, 323, 327 (Minn. 1998); *State v. Schmit*, 329 N.W.2d 56, 58 (Minn. 1983); *State v. Ming Sen Shiue*, 326 N.W.2d 648, 654-55 (Minn. 1982). In *Shiue*, the district court imposed a greater-than-double upward durational sentencing departure for a second-degree murder conviction when the defendant abducted a six-year-old boy, put him in the trunk of his car and drove

---

[1]   At the time *Morales* and *Profit* were decided, the guidelines did not include committing an offense in the presence of a child or in the victim's zone of privacy as aggravating factors. *See* Minn. Sent. Guidelines II.D.2.b. (1981). After *Morales* and *Profit* were decided, the guidelines were updated to list the two circumstances as aggravating factors. *See* Minn. Sent. Guidelines 2.D.3.b.(13)-(14).

around for an hour, and then killed him with a crowbar in a deserted area. 326 N.W.2d at 649-50. The defendant left the body hidden in dense brush in this remote location. *Id.* Several months after the boy was reported missing, the defendant agreed to tell law enforcement where the body was located in exchange for not being charged with first-degree murder. *Id.* at 650.

In affirming the upward durational departure, we stated that "the concealment [of the body] was an aggravating factor to be considered." *Id.* at 655. We reasoned that "[f]or five months, [the victim]'s family suffered a great deal of trauma, not knowing whether their son was dead or alive." *Id.* "The inclusion of concealment as an aggravating factor [was] justified not only by the trauma to close relatives, but by independent policy reasons" of preventing defendants from using the unknown location of a murder victim's body as a negotiating chip to receive a reduced charge. *Id.*

One month after *Shiue*, we decided *State v. Schmit*, 329 N.W.2d 56 (Minn. 1983). In *Schmit,* we affirmed an upward durational sentencing departure in a first-degree heat-of-passion manslaughter case but reduced it to a double durational departure. *Id.* at 56. The defendant killed his wife, and the next day he took her body and left it near some railroad tracks, where it was discovered about 2 months later. *Id.* The district court relied, in part, on "the manner in which defendant disposed of the victim's body" in justifying the sentencing departure. *Id.* at 58 n.1. We stated that "[b]ecause defendant made no effort to bargain with information concerning the location of the body, his concealment of the body does not operate as an aggravating factor in sentencing." *Id.*

8

Arguably, *Schmit* could be read to limit concealment of a body as an aggravating factor to those circumstances in which the defendant attempts to bargain with information concerning the location of the body. But we rejected such a limitation in two subsequent cases. *State v. Griller*, 583 N.W.2d 736 (Minn. 1998); *State v. Folkers*, 581 N.W.2d 321 (Minn. 1998). In *Folkers*, the defendant shot his girlfriend; the next day he put her body in her van and abandoned the van in a parking lot. 581 N.W.2d at 323. We affirmed an upward durational sentencing departure, concluding, among other things, that Folkers "treated the victim with particular cruelty in that he attempted to conceal her body." *Id.* at 327. We reasoned that "[a] finding that the victim was treated with particular cruelty alone would be enough to justify the departure." *Id.* And in *Griller*, we affirmed an upward durational sentencing departure for second-degree murder that the district court based, in part, on concealment of the body when the defendant dismembered the victim and buried the body parts in his back yard. 583 N.W.2d at 738-39, 744.

Our decisions in *Folkers* and *Griller* introduced confusion into the law. We did not mention *Schmit* in either of these cases. *See Griller*, 583 N.W.2d at 744; *Folkers*, 581 N.W.2d at 327. Because *Folkers* and *Griller* did not mention *Schmit*, it was unclear as to what circumstances, if any, would limit the use of concealment of the victim's body as an aggravating factor.

We granted review in *State v. Leja* to clarify when concealment of a body could be an aggravating factor. 684 N.W.2d 442 (Minn. 2004). In *Leja*, the defendant was convicted of aiding and abetting second-degree unintentional murder. *Id.* at 443. (Anderson, Paul, J., plurality opinion). The defendant's accomplices killed the victim

9

and dismembered his body, and the defendant helped to hide the victim's body parts in Wisconsin. *Id.* at 444-46 (Anderson, Paul, J., plurality opinion).

Unfortunately, we were unable to clarify the law. Although we reversed the upward departure, only three members of the court concluded that concealment of the victim's body, without additional facts such as the use of the location of the body as a bargaining chip, does not justify an upward durational sentencing departure. *See id.* at 449-50 (Anderson, Paul, J., plurality opinion). One member of the court concurred in the result, but on different grounds than the plurality opinion—specifically, that the district court could not base an upward departure on concealment of the body because it constituted the separate offense of accomplice after the fact. *Id.* at 451-52 (Anderson, Russell, J., concurring specially). Three members of the court dissented and concluded that concealment of the victim's body alone is a sufficient basis for an upward durational departure and that the district court did not abuse its discretion in imposing the departure. *Id.* at 456-57 (Blatz, C.J., dissenting, joined by Gilbert, Meyer, JJ.).[2]

---

[2] The dissent argues our law is clearly settled that concealment of a body is not an aggravating factor unless the defendant attempts to use concealment as a bargaining chip. We disagree. Our plurality opinion in *Leja* reflects the lack of clarity on this question. The dissent alleges that in *Leja* "four members of the court rejected the State's argument that concealment of the body should, by itself, be an aggravating factor sufficient to justify an upward durational departure." Only the three members of the court who joined the plurality rejected this argument. *See Leja*, 684 N.W.2d at 449-50 (Anderson, Paul, J., plurality opinion). In his concurrence, Justice Russell Anderson did not join the plurality's conclusion on this issue; indeed, he expressed no view on the question of whether concealment of a body could be an aggravating factor only if the defendant tried to use that concealment as a bargaining chip. *See id.* at 450-53 (Anderson, Russell, J., concurring specially). Instead, Justice Russell Anderson's concurrence based its analysis

(Footnote continued on next page.)

10

Today, we answer the question left open by *Leja.* We conclude that the concealment of a homicide victim's body, in and of itself, may be an aggravating factor under the sentencing guidelines that supports an upward durational sentencing departure.[3] The offender's conduct in concealing the victim's body is more serious than the typical second-degree unintentional murder because family and friends of a victim suffer additional trauma by not knowing whether their relative or friend is dead or alive, and concealment is contrary to the proper, respectful treatment due to the remains of a deceased person.[4] *Shiue*, 326 N.W.2d at 655.

Previously, we have relied on the harm caused to people other than the victim when recognizing aggravating factors that are not specifically listed in the guidelines.[5] *See Edwards*, 774 N.W.2d at 607 (holding that the district court did not abuse its

---

(Footnote continued from previous page.)
primarily on the fact that the concealment was a separate incident from the underlying crime of unintentional felony murder.

[3] To the extent that *State v. Schmit*, 329 N.W.2d 56, 58 n.1 (Minn. 1983), is inconsistent with this decision, that portion of *Schmit* is no longer good law.

[4] By concealing the victim's body, we mean disposing of the victim's body in a manner that impedes its discovery.

[5] The dissent claims these cases are distinguishable because the other people who were harmed by the defendant's conduct "were present at the scene when the crime was committed." This distinction does not apply to *State v. Elkins*, 346 N.W.2d 116, 119 (Minn. 1984), and *Shiue*, 326 N.W.2d at 655. The dissent is correct that in some of the cases cited above, the other people who were harmed by the defendant's conduct were physically present when the offense was committed. *See Edwards*, 774 N.W.2d at 600; *State v. Mitjans*, 408 N.W.2d 824, 834 (Minn. 1987); *Profit*, 323 N.W.2d at 36. But the dissent cites no language from these decisions indicating that the imposition of an upward durational departure is expressly limited to factual situations in which the other people harmed are present when the offense is committed.

11

discretion in concluding first-degree assault was committed in a particularly serious way because the defendant put at risk a large number of people who were near the victim when the defendant shot him); *State v. Mitjans*, 408 N.W.2d 824, 834 (Minn. 1987) (upholding upward durational sentencing departure in second-degree unintentional murder case because shots fired in a bar put others at risk); *State v. Elkins*, 346 N.W.2d 116, 119 (Minn. 1984) (affirming an upward durational sentencing departure because, among other reasons, the defendant pinned the blame for the crime on someone else); *Shiue*, 326 N.W.2d at 655 (recognizing that concealment of a body is an aggravating factor because of trauma caused to the victim's family); *State v. Profit*, 323 N.W.2d 34, 36 (Minn. 1982) (upholding an upward durational sentencing departure for criminal sexual conduct that was committed at a daycare in front of children because "while the children maybe were not technically victims of the crime, they were victims in another sense"). Consequently, the concealment of a homicide victim's body, in and of itself, may be an aggravating factor that supports an upward durational departure.

B.

The dissent claims that Hicks's concealment of the body was an "afterthought" to the murder and was not "part of a prearranged scheme." But we have long recognized that a defendant's conduct in concealing a crime is part of the same behavioral incident as the underlying offense. *See State v. Gibson*, 478 N.W.2d 496, 497 (Minn. 1991) (explaining that when a defendant commits a substantially contemporaneous second offense in order to avoid apprehension for the first offense, both offenses are part of the same behavioral incident). As a result, a defendant's conduct in concealing a victim's

12

body is generally part of the defendant's conduct of committing a homicide. It is conduct that is more serious than that typically involved in a homicide. Consequently, the dissent's claim that our decision "undermines the important sentencing principles of proportionality, uniformity, predictability, and rationality" is without merit.

Moreover, our case law does not require concealment of a victim's body to be part of a prearranged scheme for it to be part of the same behavioral incident, as the dissent claims.[6] *See State v. Kendell*, 723 N.W.2d 597, 602-04, 608 (Minn. 2006) (holding the district court correctly determined that shootings were part of a single behavioral incident under the avoidance-of-apprehension doctrine when the defendant shot at his girlfriend and children in their apartment and upon leaving the girlfriend's apartment, shot and killed an unrelated male in the doorway of the next apartment); *State v. Wipper*, 512 N.W.2d 92, 93-95 (Minn. 1994) (holding that murder and arson were committed as part of the same behavioral incident under the avoidance-of-apprehension doctrine when the defendant shot the victim and then, along with his co-defendant, decided to burn down the victim's house in an attempt to cover up the killing); *State v. Hawkins*, 511 N.W.2d 9,

---

[6]     The dissent relies on *State v. Bookwalter*, 541 N.W.2d 290 (Minn. 1995), to argue that the avoidance-of-apprehension doctrine requires that the second offense must be "part of a prearranged scheme" and cannot be an "afterthought" to the initial offense. In *Bookwalter*, we never used the phrases "prearranged scheme" or "afterthought" in our analysis under the avoidance-of-apprehension doctrine. *Id.* at 296-97. We did use these phrases in an earlier part of our opinion addressing another topic. *Id.* at 295-96. But contrary to the dissent's claim, we did not "incorporate[] that discussion into our analysis of Bookwalter's avoidance-of-apprehension claim." *See id.* at 297 (relying on two specific "factors"—"the multiplicity and disjointed nature of events between the sexual assault and the attempted murder"—in concluding that the defendant did not attempt to murder the victim in order to avoid apprehension for sexually assaulting her).

13

11, 13-14 (Minn. 1994) (holding that aggravated robbery and attempted murder were part of the same behavioral incident under the avoidance-of-apprehension doctrine when the defendant beat the victim and tried to take his money, and when the victim said he was a cop and the defendant saw the victim had a gun, the defendant said " '[w]e've got to do him' "). Thus, the dissent's claim that Hicks's concealment of Rush's body necessarily constitutes a separate offense is without merit.

When viewed in their totality, the facts of this case establish that Hicks's concealment of Rush's body was substantially contemporaneous to her murder. The evidence presented at trial shows that Hicks and Rush argued in her apartment, and Rush threatened to call the police. Hicks told Rush he "wasn't going to let another bitch send him back to prison." During the course of this argument, Hicks went into the bedroom, hit Rush on the head with a hammer, and killed her. Hicks then went into the living room and began devising a plan to get rid of Rush's body. Hicks eventually decided to dump Rush's body in Brooklyn Park in the middle of the night. He left the apartment only to retrieve a large hockey bag from the trunk of his car. Later that night, he placed Rush's body into that bag, put the bag in the trunk of his car, drove to Brooklyn Park, and then buried Rush's body in a shallow grave in a park. Although "some hours" passed between the murder and Hicks's removal of Rush's body from the apartment, the concealment of Rush's body may still be considered part of the same conduct as the murder. *See Bixby v. State*, 344 N.W.2d 390, 393 (Minn. 1984) (holding that two separate acts of criminal sexual conduct involving the same victim committed in two locations over the course of one evening were part of the same behavioral incident); *State v. Herberg*, 324 N.W.2d

14

346, 349 (Minn. 1982) (same); *see also State v. Musta*, 284 Minn. 359, 364, 170 N.W.2d 341, 345 (1969) (explaining that if the defendant had been charged with only robbery, "evidence of his efforts to escape apprehension including the exchange of gunfire [with police] which constituted the assault" and which occurred several hours after the robbery, "would have been admissible as evidence of participation in the robbery").

C.

Hicks and the dissent also argue that concealment of a murder victim's body cannot be an aggravating factor because it constitutes the uncharged offense of interfering with a dead body. *See* Minn. Stat. § 609.502, subd. 1 (2014) ("Whoever interferes with the body or scene of death with intent to mislead the coroner or conceal evidence is guilty of a gross misdemeanor.") Relying on *State v. Jackson*, 749 N.W.2d 353 (Minn. 2008), Hicks contends that an upward durational sentencing departure cannot be based on a separate, uncharged offense. This argument lacks merit.

In *Jackson*, the defendant and an accomplice broke into the victim's home, the defendant assaulted the victim with a gun, and the two stole his property. 749 N.W.2d at 356. We reversed an upward durational sentencing departure the district court imposed for first-degree aggravated robbery while armed with a dangerous weapon based, in part, on the homeowner's injuries, which amounted to a third-degree assault. *Id.* at 357. We concluded the departure was improper because "[a] departure cannot be based on uncharged criminal conduct," and if third-degree assault had been charged, Minn. Stat. § 609.035 (2014), would have precluded sentencing on that offense. *Jackson*, 749 N.W.2d at 357-58. We were also concerned with the possibility that the sentencing

15

guidelines could be manipulated by bringing lesser charges than the facts permitted in order to obtain a longer sentence by withholding some facts related to greater charges to use as an aggravating factor at sentencing.[7] *Id.* at 357-58; *see also State v. Edwards*, 774 N.W.2d 596, 606 (Minn. 2009) (interpreting *Jackson* as expressing concern that the prosecution was "manipulating" the sentencing guidelines by undercharging Jackson).

*Jackson* is distinguishable. Unlike *Jackson*, there is no concern in this case of sentencing manipulation by the State. 749 N.W.2d at 357-58. The State did not undercharge Hicks when it charged him with two counts of second-degree murder.

More importantly, in *Edwards*, 774 N.W.2d at 601-02, 606, we clarified our discussion in *Jackson* regarding what facts may be used to support an upward durational sentencing departure when the facts relate to the offense of conviction and another offense. Specifically, in *Edwards* we rejected the defendant's argument that our case law "expressly bar[s] the district court from considering facts to depart simply because those facts related to another offense that arose out of the same behavioral incident." 774 N.W.2d at 604. Instead, we explained that "[u]nder our sentencing jurisprudence, it is permissible for the district court to impose an upward sentencing departure" if the facts

---

[7] Following our decision in *Jackson*, the Legislature amended Minn. Stat. § 244.10 to add a provision stating, "[n]otwithstanding section 609.04 or 609.035, or other law to the contrary, when a court sentences an offender for a felony conviction, the court may order an aggravated sentence beyond the range specified in the sentencing guidelines grid based on any aggravating factor arising from the same course of conduct." Act of May 11, 2009, ch. 59, art. 5, § 8, 2009 Minn. Laws 346, 367 (codified at Minn. Stat. § 244.10, subd. 5a(b) (2014)). Thus, the Legislature has apparently limited the impact of *Jackson.* This language, however, does not apply to this case. *See id.*, 2009 Minn. Laws at 367 (stating that the amendment applies to crimes committed on or after August 1, 2009).

16

" 'available' for departure" establish "that the defendant committed the offense in question in a particularly serious way." *Id.* at 601-02. We held that facts from a single behavioral incident that relate to multiple offenses may be relied on to support a durational departure "if those facts show that the defendant committed the offense being sentenced in a particularly serious way." *Id.* at 604. In *Edwards*, we found *Jackson* distinguishable on several grounds, including that "there [was] no evidence of sentence 'manipulation' by the State." *Edwards*, 774 N.W.2d at 606.

Consequently, the facts of concealing a homicide victim's body are available for departure in appropriate cases. *See Edwards*, 774 N.W.2d at 601. In a second-degree unintentional murder case, the facts of concealment of a victim's body may be part of a single behavioral incident that relate to both second-degree unintentional murder and interfering with a dead body. *See State v. Gibson*, 478 N.W.2d 496, 497 (Minn. 1991). For the reasons we previously articulated, these facts may show that the defendant committed second-degree unintentional murder in a particularly serious way. As a result, a district court may base an upward durational departure on the defendant's concealment of a victim's body when sentencing a defendant for second-degree unintentional murder.

We recognize that the concealment of a victim's body may not always demonstrate that the offense was committed in a particularly serious way. For example, if the body were concealed for a day, then it may not have been committed in a particular serious way. In each case, the district court will need to determine if the particular facts of concealment as found by a sentencing jury or admitted by the defendant demonstrate that the offense was committed in a particularly serious way.

17

II.

Having determined that concealment of a homicide victim's body may be a reason for a district court to impose an upward durational sentencing departure, we now consider whether the district court abused its discretion in imposing an upward durational sentencing departure based on the facts of this case. "If the reasons given for an upward departure are legally permissible and factually supported in the record, the departure will be affirmed." *State v. Edwards*, 774 N.W.2d 596, 601 (Minn. 2009).

The district court's stated reason for the durational departure was its conclusion that the disposal and concealment of Rush's body was particularly cruel under the facts of this case. Despite the district court's use of the phrase "particular cruelty," it is clear that the district court's reason for imposing an upward durational departure was Hicks's concealment of Rush's body. The State argued to the district court that concealment of a body and particular cruelty were essentially the same because appellate decisions had used different language to refer to the same aggravating factor. And the district court stated that Hicks's concealment of Rush's body is what made the offense more serious than the typical second-degree unintentional murder.

We conclude that concealment of a homicide victim's body is a legally permissible reason for a departure and is factually supported by the record in this case. The evidence shows Hicks concealed Rush's body by burying it in a shallow grave in a park. There was extensive testimony from Rush's daughter regarding the trauma and anguish Rush's family experienced because her body was concealed for nearly 3 years.

18

As a result, we hold the district court did not abuse its discretion when it imposed an upward durational departure on Hicks's sentence for second-degree unintentional murder.

Affirmed.

WRIGHT, Justice (dissenting).

"Hard cases should not be allowed to make bad law." *Young v. City of Mankato*, 97 Minn. 4, 8, 105 N.W. 969, 971 (1905) (internal quotation marks omitted). The anguish experienced by the Rush family is heartbreaking and, therefore, the temptation to adopt a rule of law that might provide some solace is powerful. Nevertheless, we must not sacrifice important legal principles in the pursuit of such a rule. By affirming the district court's departure from the Minnesota Sentencing Guidelines, the court not only undermines the principles of uniformity, proportionality, rationality, and predictability that form the foundation of our sentencing law, the court also fails to abide by the doctrine of stare decisis. For these reasons, I conclude that the law compels a sentence no greater than the upper limit of the presumptive guideline range. Therefore, I respectfully dissent.

The question presented in this case is whether a district court may depart from the presumptive sentence for a second-degree murder conviction based solely on the defendant's uncharged offense of concealment of the victim's body. The majority answers this question in the affirmative by: (1) determining that the murder and concealment were part of the same behavioral incident; (2) concluding that the murder was committed in a particularly serious way because, after committing the murder, Hicks concealed the victim's body, which caused additional trauma to the victim's family and friends; and (3) overruling *State v. Schmit*, 329 N.W.2d 56, 58 n.1 (Minn. 1983) (holding that concealment of the murder victim's body did not operate as an aggravating factor in

sentencing because the defendant made no effort to bargain with information concerning the location of the body). Each rationale that the majority offers reflects an abandonment of important and well-established legal principles. My analysis begins with a summary of the principles underlying our sentencing law and proceeds to an examination of each rationale offered by the majority.

I.

In Minnesota, we "protect the individual against the misuse of the criminal law by . . . authorizing sentences reasonably related to the conduct and character of the convicted person." Minn. Stat. § 609.01, subd. 1(2) (2014). Moreover, the overarching principles in all sentencings are "rationality, predictability, and consistency." *State v. Misquadace*, 644 N.W.2d 65, 71 (Minn. 2002). The Minnesota Sentencing Guidelines embody the "state public policy to maintain uniformity, proportionality, rationality, and predictability in sentencing." Minn. Stat. § 244.09, subd. 5 (2014); *see Taylor v. State*, 670 N.W.2d 584, 586 (Minn. 2003). The sentencing guidelines ensure that " 'sanctions following conviction of a felony are proportional to the severity of the *offense of conviction* and the extent of the offender's criminal history.' " *Tucker v. State*, 799 N.W.2d 583, 586 (Minn. 2011) (emphasis added) (quoting Minn. Sent. Guidelines I (2010)). To promote uniformity and proportionality in sentencing, " 'departures from the presumptive guidelines sentence are discouraged.' " *Id.* (quoting *State v. Jackson*, 749 N.W.2d 353, 357 (Minn. 2009). Put differently, the factors justifying departures "are intended to describe specific situations involving a small number of cases." Minn. Sent. Guidelines cmt. 2.D.301. The Minnesota Sentencing Guidelines Commission expressly

"rejects factors that are general in nature, and that could apply to large numbers of cases." *Id*. With these important sentencing principles as my lodestar, I consider each rationale that the majority offers.

II.

The majority contends that the murder and concealment of Rush's body were part of a single behavioral incident and, therefore, the prohibition against using facts underlying a separate, uncharged offense is not implicated in this case. *See State v. Edwards*, 774 N.W.2d 596, 602 (Minn. 2009) (explaining that a sentencing departure may not be based on a separate, uncharged offense). I disagree. The concealment of Rush's body is a separate, *uncharged* violation of Minn. Stat. § 609.502, subd. 1 (2014), and those facts that underlie the concealment cannot be used to enhance the murder sentence.

When determining whether crimes are committed as part of a single behavioral incident, courts consider whether there is a "single criminal objective" and a "unity of time and place." *State v. Bookwalter*, 541 N.W.2d 290, 294-95 (Minn. 1995); *State v. Johnson*, 273 Minn. 394, 404-05, 141 N.W.2d 517, 525 (1966) (describing the factors as time, place, and an effort to obtain a single criminal objective). The application of this test depends heavily on the facts and circumstances of the particular case. *State v. Bauer*, 792 N.W.2d 825, 828 (Minn. 2011). For example, under the avoidance-of-apprehension doctrine, when a defendant commits a *substantially contemporaneous* second offense to avoid apprehension for the first offense, we have held that the offenses are part of the same behavioral incident. *See State v. Gibson*, 478 N.W.2d 496, 497 (Minn. 1991)

(concluding that the offenses of criminal vehicular operation and leaving the scene of an accident arose from the same behavioral incident). When a second offense is committed 5 hours after the first offense, "in all likelihood we would not consider it to have been committed 'substantially contemporaneously' with the first offense." *Bookwalter*, 541 N.W.2d at 297. Moreover, when the avoidance-of-apprehension offense is not committed as part of a prearranged scheme, but instead is committed at a different time and place as an "afterthought," we have concluded that the two crimes do not arise from a single behavioral incident.[1] *See id.* at 296 (holding that the initial criminal sexual assault and the subsequent decision to kill the victim to avoid apprehension were not part of a single behavioral incident); *see also State v. Leja*, 684 N.W.2d 442, 451 (Minn. 2004) (Anderson, Russell, J., concurring specially) (concluding that the concealment of the victim's body was not part of the same behavioral incident as the murder).

Applying the single-behavioral-incident test to the particular facts and circumstances of Hicks's case, I conclude that the offenses of second-degree

---

[1] The majority contends our decision in *Bookwalter* does not discuss the need for a prearranged scheme in the context of the avoidance-of-apprehension doctrine. I respectfully disagree. Although we initially discussed the need for a prearranged scheme in the context of whether the offenses were part of one behavioral incident, we later incorporated that discussion into our analysis of Bookwalter's avoidance-of-apprehension claim. *Bookwalter*, 541 N.W.2d at 296-97. More specifically, in rejecting Bookwalter's avoidance-of-apprehension claim, we explicitly relied on the "factors that formed the basis of our conclusion that the sexual assault and attempted murder were not one behavioral incident." *Id.* at 297. Our avoidance-of-apprehension analysis was not limited to "the multiplicity and disjointed nature of events," but instead included a discussion of the district court's finding that Bookwalter's motivation for the attempted murder never became clear. *Id.* In other words, our analysis considered not only the time and place, but also the singleness of purpose that is found in a prearranged scheme.

unintentional murder and concealment of Rush's body did not arise from a single behavioral incident. The State established that Hicks inflicted blunt-force trauma to Rush's skull, which caused her death. But because the State failed to establish that Hicks intended to cause Rush's death, Hicks was acquitted of second-degree intentional murder. According to the facts established at trial, Hicks did not intend to kill Rush—her murder was unintentional. Hicks then went into the living room and *only then began to devise* a plan to conceal Rush's body. He eventually decided to hide Rush's body in Brooklyn Park in the middle of the night. Later that night, Hicks placed the body into the trunk of his car and transported the body from Columbia Heights to a remote location in Brooklyn Park, where he buried and concealed it. On these facts, it necessarily follows that the concealment of Rush's body was not part of a prearranged program of events when Hicks struck Rush with the blunt instrument.[2] The concealment was committed as an "afterthought." Moreover, several hours passed before Hicks transported Rush's body to Brooklyn Park and therefore the concealment was not committed "substantially contemporaneously" with the murder. Instead, the concealment was committed at a different time and place. Because no principled distinction can be drawn between the facts of this case and those in *Bookwalter*, the circumstances here compel the conclusion

---

[2]     Ample evidentiary support for this conclusion was presented in the trial testimony of a fellow inmate at the Anoka County Jail in whom Hicks confided. When describing the murder and subsequent concealment to the inmate, Hicks said that after he killed Rush, he "went out to the living room, kept drinking, and . . . had to come up with a plan to get rid of her body." He considered a number of plans, including disposing of the body in the Mississippi River. After "some hours," he placed her body in a hockey bag, transported it to a field in the trunk of his car, and hid it.

that the offenses of second-degree unintentional murder and the concealment of Rush's body are not part of a single behavioral incident.

Since the concealment of Rush's body constitutes a separate, uncharged offense, I next consider whether the district court erred by imposing an upward sentencing departure based on the facts underlying the concealment of Rush's body. In *Edwards*, we reaffirmed the rule that the facts underlying a separate, uncharged offense may not be used to support an upward sentencing departure. 774 N.W.2d at 602 (citing *State v. Ott*, 341 N.W.2d 883, 884 (Minn. 1984)). In explaining the rationale for the rule, we said that the facts underlying a separate, uncharged offense "do not show that the offense being sentenced was committed in a particularly serious way." *Id.* Moreover, we have repeatedly said that it is "unfair" to enhance a sentence based on facts underlying a separate, uncharged offense. *See, e.g.*, *Leja*, 684 N.W.2d at 452 (Anderson, Russell, J., concurring specially) (explaining that durational departures should not be based on evidence of an offense never charged); *State v. Brusven*, 327 N.W.2d 591, 593 (Minn. 1982) (explaining that the district court's reliance on evidence that the defendant committed separate acts of sexual misconduct with other children was unfair); *State v. Barnes*, 313 N.W.2d 1, 3 (Minn. 1981) ("[I]t would be unfair to try to justify the departure on the basis of the police reports suggesting the defendant maybe could have been convicted of violent crimes in two other instances[.]").

Applying the *Edwards* rule to the facts presented here, I conclude that the district court erred when it imposed an upward sentencing departure based on the facts underlying the uncharged concealment offense. To be clear, had the prosecutor charged

Hicks and the jury convicted him of the separate offense of concealing Rush's body, I would agree that the circumstances surrounding the concealment, including the victim impact statement provided by Rush's daughter, demonstrate that the concealment was committed in a particularly serious way. Hicks did not merely interfere with the scene of death. He concealed Rush's body, transported it to a remote location in another city, and then hid the body in a location where it remained for years. Indeed, the concealment of Rush's body caused great anguish to Rush's family. These circumstances of concealment, however, do not meet the legal standard for a sentencing departure, which requires that Hicks committed the second-degree *murder* in a particularly serious way.

By affirming the district court's use of facts underlying the separate, uncharged concealment offense, the majority undermines the important sentencing principles of proportionality, uniformity, predictability, and rationality. When sentencing departures are based on separate, uncharged offenses, at least four unauthorized consequences can occur: (1) a defendant's punishment may be disproportionate to the conduct underlying the offense of conviction; (2) defendants who commit the offense of conviction in an identical manner may receive different punishments; (3) the conduct underlying the offense of conviction is no longer a reliable predictor of punishment; and (4) the resulting sentencing scheme lacks rationality. The facts of this case, although heartbreaking, do not warrant an abandonment of the bedrock principles of proportionality, uniformity, predictability, and rationality in sentencing. I, therefore, respectfully dissent from the majority's conclusion that the upward sentencing departure at issue here was justified by the facts underlying the separate, uncharged offense of concealment of Rush's body.

# III.

The majority contends that the murder was committed in a particularly serious way because Hicks concealed the victim's body, causing additional trauma to the victim's family and friends. This expansion of the law is unprecedented and ill-advised.

The majority accurately states that we have affirmed sentencing departures based on the impact of the offense of conviction on bystanders who were "not technically victims of the crime." *State v. Profit*, 323 N.W.2d 34, 36 (Minn. 1982); *see also Edwards*, 774 N.W.2d at 607 (explaining that the defendant's conduct was particularly serious because it exposed bystanders to injury or death); *State v. Mitjans*, 408 N.W.2d 824, 834 (Minn. 1987) (same). However, the circumstances of these cases are distinguishable in a consequential way. In each of these cases the bystanders were present at the scene when the crime was committed.

In *Profit*, the defendant went to a daycare center and forced the woman in charge into a bathroom at knife point, where he then stole her rings and tried to kiss her. 323 N.W.2d at 35. When the daycare children started to make noise, he tied her up with her bra and sweater and walked her toward an outer door where he encountered a parent who was dropping off a child. *Id.* We concluded that, although the children present at the daycare center "were not technically victims of the crime," committing the offense of conviction "in front of the children was a particularly outrageous act." *Id.* at 36. This was especially true because the defendant "knew when he went to the center that there would be children present who would witness part of what he planned to do." *Id.* We later clarified that the presence of children is an aggravating sentencing factor only when

the children "saw, heard, or otherwise witnessed the offense." *State v. Vance*, 765 N.W.2d 390, 394 (Minn. 2009). The same principle that bystanders must witness the offense or be present when the offense occurs should apply here to foreclose a sentencing departure.

In *Edwards*, the defendant "fired seven times at or toward a group of nine people in the immediate area, exposing all of them to injury or death . . . . Defendant's conduct was particularly serious and represented a greater than normal danger to the safety of other people." 774 N.W.2d at 600. That the defendant placed bystanders at risk *physically* when he shot the victim in a public place made this offense particularly serious. Similarly, the defendant in *Mitjans* committed murder in a bar, where his shots placed the other patrons in danger of physical harm. 408 N.W.2d at 834.

*Profit*, *Edwards*, and *Mitjans* are readily distinguishable from this case because Rush's adult daughter was not physically present when the offense of conviction was committed. Consequently, the majority's conclusion that a sentencing departure may be based on emotional harm to third parties who were not present at the scene is unprecedented. The majority cites *State v. Ming Sen Shiue*, 326 N.W.2d 648 (Minn. 1982), for the proposition that the trauma caused to a victim's family by the defendant's concealment of a body may justify an aggravated sentencing departure. The majority's reliance on *Shiue* is misplaced because *Shiue* is distinguishable in an important way. In *Shiue,* the defendant concealed the victim's body and used the concern of the parents and authorities to bargain for an agreement to avoid prosecution for first-degree murder. 326 N.W.2d at 655. While we recognized that the defendant's actions caused trauma to the

victim's family, our analysis in *Shiue* was driven by the public policy of discouraging "[o]ther accused persons" from using the disclosure of a body's whereabouts "in negotiating a plea."[3]  *Id.*  We later reaffirmed the importance of the public policy justification in *Schmit* when we concluded that, "[b]ecause defendant made no effort to bargain with information concerning the location of the body, his concealment of the body does not operate as an aggravating factor in sentencing."  329 N.W.2d at 58 n.1.

The majority's determination that the facts of this case merit a departure also is ill-founded in light of the Minnesota Sentencing Guidelines.  A departure based on harm to remote third parties is precisely the kind of departure against which the Minnesota Sentencing Guidelines caution.  That Rush's family suffered greatly because of Hicks's actions is readily discernable from the transcript.  And no aspect of my legal analysis minimizes this terrible tragedy.  However, if the suffering of individuals other than the victim justified the determination that a crime was more serious than a typical case, a departure similar to the one applied to Hicks's sentence would apply in countless cases, contrary to the Minnesota Sentencing Guidelines Commission's instructions.  *See* Minn. Sent. Guidelines cmt. 2.D.301.  Such a departure also violates the principles of "uniformity, proportionality, rationality, and predictability in sentencing."  *Misquadace*,

---

[3]  Our analysis in *State v. Elkins* was driven by another unique public policy concern—discouraging "the reprehensible scheme of trying to pin the blame on a completely innocent man."  346 N.W.2d 116, 119 (Minn. 1984).  Moreover, *Elkins* involved multiple aggravating sentencing factors.  *Id.*  Consequently, *Elkins* does not support the majority's conclusion that a sentencing departure may be based solely on emotional harm to third parties who were not present at the scene of the crime.

644 N.W.2d at 67 (quoting Minn. Stat. § 244.09, subd. 5 (2000)).  If we conclude that this defendant's offense is more serious because it traumatized family members, we also conclude, however inadvertently, that the murder of an individual without close family and community ties is a less serious offense.  This distinction among victims of violent crimes not only is fundamentally unfair, but also defeats the principal purpose of the Minnesota Sentencing Guidelines and results in a sentencing regime that lacks uniformity, proportionality, and predictability.  Moreover, a sentence resulting from this kind of departure also contradicts the Legislature's directive to impose sentences that are connected to the offense conduct.  The Legislature has stated that sentences should be reasonably related to the *conduct of the convicted person*.  Minn. Stat. § 609.01, subd. 1(2).  Similarly, the Minnesota Sentencing Guidelines Commission has said that "departures from the Guidelines should not be permitted for elements of alleged offender behavior not within the definition of the conviction offense."  Minn. Sent. Guidelines cmt. 2.D.203.  Hicks was convicted of murder, not concealment.  His conduct is the offense of murder, not the act of concealment.  Therefore, the majority errs when it concludes that the concealment and resulting emotional trauma to the victim's family and friends made the commission of the murder more serious and justifies an upward durational departure.

## IV.

The majority overrules the holding in *Schmit*, which states: "Because defendant made no effort to bargain with information concerning the location of the body, his concealment of the body does not operate as an aggravating factor in sentencing."

329 N.W.2d at 58 n.1. In doing so, the analysis of the majority contravenes the doctrine of stare decisis because the analysis fails to articulate a compelling reason to overrule *Schmit*.

"The doctrine of stare decisis directs us to adhere to our former decisions in order to promote the stability of the law and the integrity of the judicial process." *Schuette v. City of Hutchinson*, 843 N.W.2d 233, 238 (Minn. 2014). Here, the majority disregards our extreme reluctance to overrule our precedent absent a compelling reason. *State v. Martin*, 773 N.W.2d 89, 98 (Minn. 2009).

The issue presented in this case—whether concealment of a body, *without* an effort to bargain with information concerning the location of the body, constitutes an aggravating sentencing factor—was squarely addressed in *Schmit*, 329 N.W.2d at 58 n.1. In *Schmit*, we expressly ruled that, "[b]ecause defendant made no effort to bargain with information concerning the location of the body, his concealment of the body does not operate as an aggravating factor in sentencing." *Id.* When the State asked us to treat our ruling in *Leja* as dicta, 684 N.W.2d at 442, four members of the court rejected the State's argument that concealment of the body should, by itself, be an aggravating factor sufficient to justify an upward durational departure. Justice Paul Anderson's opinion, which was joined by Justice Page and Justice Hanson, rejected the argument outright, stating that "Leja's participation in the concealment of [the victim's] remains, without more such as her bargaining with the authorities, does not support an upward durational departure." *Id.* at 450. Justice Russell Anderson concurred specially. He did not reach the issue of whether concealment, by itself, was an aggravating factor sufficient to justify

D-12

an upward durational departure because he concluded that the concealment was part of a separate behavioral incident, and consequently, the concealment did not support a departure from the presumptive sentence for murder. *Id.* at 451 (Anderson, Russell, J., concurring specially). Chief Justice Blatz's dissent, which was joined by Justices Gilbert and Meyer, concluded that the concealment was part of the same behavioral incident and that the concealment alone is an aggravating factor sufficient to justify an upward durational departure. *Id.* at 455-57 (Blatz, C.J., dissenting).

The State now asks us, for the second time in 10 years, to view our ruling in *Schmit* as dicta. This time the majority grants the State's request, adopting the analysis of the *Leja* dissent.[4] Just like the *Leja* dissent, the majority relies on *State v. Folkers*, 581 N.W.2d 321 (Minn. 1998), and *State v. Griller*, 583 N.W.2d 736 (Minn. 1998).

In *Folkers*, we suggested that concealment of a body was an appropriate aggravating factor because it showed particular cruelty. 581 N.W.2d at 327 (citing *Shiue*, 326 N.W.2d at 655). But the majority's rationale for relying on *Folkers* is faulty. While we concluded in *Folkers* that concealing a body fell within the particular-cruelty

---

[4]    The majority argues that its analysis does not implicate the doctrine of stare decisis because the special concurrence in *Leja* did not reach the issue of whether concealment of a body by itself is an aggravating factor. Such an argument fails to acknowledge that the majority's conclusion, that Hicks's act of concealment by itself may be an aggravating factor, is necessarily predicated on a conclusion that the concealment was part of the same behavioral incident. Therefore, the majority's argument requires not only a rejection of Justice Paul Anderson's opinion in *Leja*, but also a rejection of Justice Russell Anderson's special concurrence in *Leja*, which concluded that the concealment was *not* part of the same behavioral incident. In my view, the majority's analysis, which requires a rejection of the reasoning of four members of the court, implicates the doctrine of stare decisis.

aggravating factor, we did not reach the issue subsequently presented and decided in *Schmit*—whether concealment of a body, without an effort to bargain with information concerning the location of the body, was a separate aggravating sentencing factor.

In *Griller*, the district court articulated "*several reasons* for departing from the presumptive sentence: the concealment of [the victim]'s body, the particular cruelty Griller used in killing [the victim], and Griller's 'chilling lack of remorse' and 'persistent attempts to deny responsibility and shift blame.' " 583 N.W.2d at 744 (emphasis added). In affirming the upward departure, we summarily endorsed the district court's reasons, stating: "The Minnesota Sentencing Guidelines and precedent support the use of *these* factors to impose an upward departure." *Id.* (emphasis added). We placed the authority for our endorsement in a footnote that reads:

> *See* Minnesota Sentencing Guidelines II.D.2.b (aggravating factors); *State v. Folkers*, 581 N.W.2d 321 (Minn. 1998) (concealment of body, remorse, and attempt to shift blame); [*Rairdon v. State*, 557 N.W.2d 318, 327 (Minn. 1996)] (particular cruelty); *State v. Ming Sen Shiue*, 326 N.W.2d 648, 655 (Minn. 1982) (concealment of body).

*Id.* at 744 n.29. Admittedly, at first glance, the parenthetical descriptions of *Folkers* and *Shiue* in the *Griller* footnote could be read as suggesting that concealment of a body is by itself an aggravated sentencing factor. However, when one reads the decisions in *Folkers* and *Shiue*, it is abundantly clear that we did not hold that concealment is by itself an aggravated sentencing factor. Consequently, the majority's reliance on *Griller* also is misplaced.

In sum, the majority has not articulated a compelling reason to overrule *Schmit* because our reasoning in *Folkers* and *Griller* is consistent with *Schmit*. Moreover, the

only change since the court rejected the dissent's analysis in *Leja* is the composition of the court. In the absence of a compelling reason, the majority's decision to overrule *Schmit* contravenes the doctrine of stare decisis. By ignoring the doctrine of stare decisis, the majority destabilizes the law and calls into question the integrity of the judicial process. For these reasons, I decline to join in the majority's decision to overrule *Schmit*.

V.

The majority's decision upholds a sentencing departure based on a separate, uncharged offense, imprudently concludes that concealment of a murder victim's body may serve as the sole basis for an upward durational departure, forsakes the doctrine of stare decisis, and overrules our precedent in *Schmit*. By doing so, the majority abandons the fundamental principles of sentencing—uniformity, proportionality, rationality, and predictability. Therefore, I respectfully dissent.


PAGE, Justice (dissenting).

I join in the dissent of Justice Wright.